Jeff P. PROSTOK, et al., Appellants,

v.

Peter C. BROWNING, et al., Appellees.

No. 05–99–00826–CV.

Court of Appeals of Texas, Dallas.

Aug. 11, 2003.

Joseph Donald Carona, Dies & Hile, L.L.P., Orange, Roger Townsend, Alexan-

der Dubose Jones & Townsend LLP, Houston, Boe W. Martin, Bell, Knunnally & Martin PLLC, Dallas, Thomas M. Fulkerson, Clements O'Neill Pierce & Nickens, L.L.P., Houston, for Appellants.

Kathy Dawn Patrick, Gibbs & Brun, Houston, Tyler A. Baker, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Robert W. Jordan, Samara L. Kline, Baker & Botts, L.L.P., Thomas M. Melsheimer, Fish & Richardson L.L.P., Marie R. Yeates, Michael L. Raiff, Vinson & Elkins, L.L.P., Dallas, for Appellees.

Before Justices MOSELEY and O'NEILL.[1]

## OPINION ON MOTIONS FOR REHEARING

Opinion by Justice MOSELEY.

Several parties have filed motions for rehearing. We deny all such pending motions for rehearing. On the Court's own motion we withdraw our opinion of March 28, 2003 and vacate our judgment of that date. This is now the opinion of the Court.

This case stems from the bankruptcy proceedings of National Gypsum Company ("National Gypsum") and its parent company, Aancor Holdings, Inc. ("Aancor"). Appellants asserted various claims based on actions allegedly taken by appellees in connection with National Gypsum's valuation during the course of the bankruptcy proceedings. Pursuant to TEX.R. CIV. P. 166a(c), the trial court granted summary judgment against appellants on all their claims, which they challenge on appeal. In a cross-point, appellees contend the trial court erred in failing to grant summary

judgment on the grounds of limitations, and in granting summary judgment for appellants on an attorneys' fee shifting provision of the bankruptcy plan. For the reasons set forth below, we reverse the trial court's judgment, render judgment in part, and remand this cause for further proceedings.

### I. STANDARD OF REVIEW

The standards for reviewing a summary judgment granted pursuant to rule 166a(c) are well established. The party moving for summary judgment has the burden of showing no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972). A defendant moving for summary judgment must either (1) conclusively disprove at least one element of the plaintiff's theory of recovery, or (2) plead and conclusively establish each essential element of an affirmative defense. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex.1979); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 657 (Tex.App.-Dallas 1992, no writ).

As discussed in more detail below, the various appellees advanced several grounds in support of numerous motions for summary judgment against appellants. The trial court specifically rejected the motions based on the statute of limitations, but granted the motions for summary judgment in all other respects. However, the trial court's order does not specify which of the remaining grounds asserted in appellees' motions formed the basis, or bases, of its summary judgment. Thus,

---

1. The Honorable John Ovard, Retired, Court of Appeals, Fifth District of Texas at Dallas, was a member of the panel at the time this case was argued and submitted for decision. Due to his subsequent retirement from the Court, Justice Ovard did not participate in the issuance of this opinion. *See* TEX.R.APP. P. 41.1(a) & (b).

we affirm the summary judgment if any of the theories advanced, and not specifically rejected by the trial court, are meritorious. *See Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001) (per curiam); *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). Accordingly, appellants must show that none of appellees' remaining grounds were a proper basis for summary judgment. *See Holloway v. Starnes,* 840 S.W.2d 14, 18 (Tex.App.-Dallas 1992, writ denied).

Additionally, we consider all summary judgment grounds on which the trial court actually ruled, whether granted or denied, that are preserved for appeal and are dispositive of the appeal. *See Baker Hughes, Inc. v. Keco R. & D., Inc.,* 12 S.W.3d 1, 5 (Tex.1999); *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625–26 (Tex.1996). Further, we may also consider summary judgment grounds expressly presented to but not ruled on by the trial court, if the summary judgment movant presents the alternative grounds on appeal. *Baker Hughes, Inc.,* 12 S.W.3d at 5. Lastly, if an appellant does not properly challenge each independent ground for summary judgment asserted against a claim, we affirm the summary judgment as to that claim. *Smith v. Tilton,* 3 S.W.3d 77, 83 (Tex.App.-Dallas 1999, no pet.).

In deciding whether a disputed issue of material fact exists, that would preclude summary judgment, evidence favorable to the nonmovant will be taken as true. *Nix-on,* 690 S.W.2d at 548–49. Further, every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Id.* It is from this perspective that we review the summary judgment record.[2]

## II. BACKGROUND AND PROCEDURAL HISTORY

### A. Introduction

This is a complex case, involving issues of state and federal law litigated in a variety of courts over several years. The record is over 31,700 pages in length. The parties' briefs before this court refer to approximately 450 cases and other authorities. The appellants in this case include a group of junior bondholders of the old National Gypsum Company, represented by Prostok, Field and Earnest,[3] and several groups that had asserted asbestos related claims against the old National Gypsum Company. The appellees include some of the former officers and directors of National Gypsum and its parent company ("Officers and Directors"); their financial advisor, Donaldson, Lufkin & Jenrette Securities Corp. ("DLJ"); some of National Gypsum's senior bondholders; and the senior bondholders' financial advisor, Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey"). The new National Gypsum Company ("New NGC"), formed pursuant to a plan of reorganization approved by a federal bankruptcy court, intervened in the district court and brings a separate cross-appeal.[4]

---

**2.** The fifth point of the Officers' and Directors' motion for rehearing asked us to correct our prior opinion to make clear that we are not deciding fact issues. This is unnecessary. Both the prior opinion and this opinion make clear that we are applying the well-established standard of review for summary judgments. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985); *see also* TEX.R. CIV. P. 166a(c).

**3.** Named appellants Prostok, Field, and Earnest are the class representatives of a class of junior bondholders of National Gypsum certified by the trial court. The class certification order is not challenged in this appeal. For convenience, the class will be referred to as the "Junior Bondholders" and the Junior Bondholders and their class representatives will be referred to simply as Prostok.

**4.** New NGC will be referred to by name, and is not included in any general reference to "appellants."

The parties are described in more detail in the following sections. However, the essence of the case is a dispute between the junior bondholders and asbestos claimants on the one side (as appellants herein), and the senior bondholders, management of National Gypsum, and their respective financial advisors on the other (as appellees herein), with cross-appellant New NGC generally siding with the latter group regarding the merits of that dispute.

During this appeal some of the parties have settled some or all of the claims asserted by and/or against them. Those claims and parties will be identified herein as well. However, the issues before this court are framed in part by the nature of the litigation below and before other courts, and by the various parties' participation in portions of that litigation. Thus, for purposes of clarity we describe the entirety of the disputes between the parties.

## B. National Gypsum Bankruptcy

In 1986, National Gypsum, a manufacturer of building materials, was the subject of a leveraged buyout, becoming a wholly owned subsidiary of Aancor. To finance this buyout, National Gypsum and Aancor issued approximately $1 billion in bonds.

On October 28, 1990, faced with mounting debt and a multitude of asbestos lawsuits, National Gypsum and Aancor each filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. The cases were consolidated and jointly administered in the United States Bankruptcy Court for the Northern District of Texas in Dallas; for convenience the two proceedings are referred to herein as one proceeding—the National Gypsum bankruptcy. At the time, the National Gypsum bankruptcy was one of the largest bankruptcy cases in American history. The bankruptcy case was highly contentious; National Gypsum's valuation was hotly contested by the various interested parties, and the parties advocated multiple competing plans of reorganization.

National Gypsum had three classes of publicly traded debt: (1) senior notes worth about $295 million; (2) senior debentures worth about $188 million; and (3) junior bonds worth about $537 million.[5] The senior notes and debentures were held by several entities referred to as the Senior Bondholders, who are some of the appellees in this case.[6]

The junior bonds were held by persons and entities referred to as the Junior Bondholders, including appellant Prostok and the class members he represents. Others interested in the National Gypsum bankruptcy included parties holding actual or potential claims against National Gypsum arising from the manufacture, distribution, or use of asbestos products; these parties are generally referred to herein as the Asbestos Claimants.[7]

---

5. These amounts are the alleged aggregate face value of the various classes of debt as of the date of the bankruptcy filing.

6. The "Senior Bondholders" are: (1) appellee Goldman, Sachs & Company's Water Street Corporate Recovery Fund I, L.P. (Water Street); (2) appellee Fidelity Investments' Fidelity Management and Research Company (Fidelity Management); and (3) a group of appellees referred to as "the TCW Parties," consisting of TCW Special Credits, The TCW Group, Inc., Trust Company of the West, and TCW Asset Management Company. Although the TCW Parties are among the Senior Bondholders, because of some procedural differences between them and the other Senior Bondholders, they will frequently be referred to separately.

7. The "Asbestos Claimants" are: (1) appellants NGC Asbestos Disease and Property Damage Trust, a trust created by the bankruptcy plan, represented by its three trustees, appellants W.D. Hilton, Jr., Alan R. Kahn and Walter J. Taggart (the "Trust"); (2) appellant

### 1. Allegations of Undervaluation

The Junior Bondholders' interests were represented in the bankruptcy by the official committee of bond and trade unsecured creditors ("BT Committee"). In January 1992, the BT Committee attempted to replace National Gypsum's management, which was acting as a debtor-in-possession under the Bankruptcy Code, with a bankruptcy trustee. Among other allegations, the BT Committee claimed National Gypsum's management and its financial advisor, DLJ, were manipulating the economic projections of the company in order to diminish its value. However in March 1992, after a two-day evidentiary hearing, the bankruptcy court rejected the BT Committee's motion, stating that insufficient evidence was presented to justify removing National Gypsum as debtor-in-possession and replacing it with a trustee.

### 2. Reorganization Plans

National Gypsum submitted a reorganization plan to the bankruptcy court based on a valuation of its business of between $300 and $375 million. The plan proposed to divide National Gypsum's assets between two entities. National Gypsum would change its name and keep certain insurance policies and the Austin Company, a National Gypsum subsidiary. The plan further created and funded the NGC Asbestos Disease and Property Damage Trust,[8] which would own the stock of old National Gypsum and use its funds to settle asbestos claims against National Gypsum.[9]

The second entity receiving National Gypsum's assets under its proposed plan was a new National Gypsum Company ("New NGC"), a separate corporate entity to be organized under Delaware law. New NGC would own National Gypsum's operating assets and ongoing business. The management team of National Gypsum would remain as the management team of New NGC. New NGC would largely be owned by the senior noteholders and bondholders of National Gypsum, with the junior bondholders receiving warrants to acquire an additional 10% of the shares in the new company. The senior noteholders would receive new senior notes and approximately 67% of the common stock in New NGC. The holders of senior debentures would receive 20% of the common stock of New NGC. The value of the war-

---

Daniel M. Phillips, the Legal Representative appointed for Unknown and Future Asbestos Bodily–Injury Claimants (those persons whose illnesses caused by National Gypsum asbestos-containing products had not yet manifested themselves at the time of the National Gypsum bankruptcy); and (3) a purported class of asbestos claimants seeking damages based on the removal and replacement of asbestos-containing materials, represented by appellants Birdville Independent School District and Tyler Junior College (the "School Districts").

8. This is the Trust mentioned earlier, having as its trustees appellants Hilton, Kahn and Taggart.

9. Under the modified plan ultimately confirmed by the bankruptcy court, the claims of unknown and future asbestos claimants were not discharged, but were "channeled" to the Trust first until its funds were exhausted. After exhaustion of their remedies against the Trust and its assets, unknown and future claimants may seek to impose liability against New NGC. See Nat'l Gypsum Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.), 219 F.3d 478, 493 (5th Cir.2000) (plan did not impose successor liability on New NGC for unknown and future asbestos claims after the Trust's assets were exhausted, but claimants could pursue New NGC under state successor liability law after exhausting their remedies against the Trust); In re Nat'l Gypsum Co., 257 B.R. 184, 221–22 (Bankr. N.D.Tex.2000) (New NGC required to fund $144.5 million to Trust in order to maintain channeling order for first two years of alternate facility for resolving asbestos claim or channeling order will terminate).

rants received by the junior bondholders was considered "speculative in nature." The Senior Bondholders and the committee of asbestos claimants supported National Gypsum's reorganization plan, and did not propose a plan of their own.

Unhappy with management's valuation of National Gypsum and their resulting prospective share of New NGC, the BT Committee proposed a competing plan of reorganization based on a valuation of National Gypsum's business of $630 million (in contrast to the $300 to $375 million valuation asserted by National Gypsum). Regarding selling, general and administrative expenses, the BT Committee plan further opined that a "cost conscious management would succeed in identifying cost reductions and efficiencies so as to effect an annualized savings per year of $5.0 million." The BT Committee plan used additional debt to increase the recoveries of creditors and allegedly avoid the danger of undervaluation in the National Gypsum plan. Under the BT Committee plan, the senior noteholders would have received two new classes of corporate notes rather than stock in the new company. The holders of senior debentures would have received 100% of the common stock of New NGC. The junior bondholders under this plan would have received warrants, as under the National Gypsum plan, but the warrants would have entitled them to purchase up to 45% of the new company at a lower exercise price.[10]

During the hearings on the confirmation of a reorganization plan, the BT Committee and other interested parties contested National Gypsum's valuation. The BT Committee alleged that management and its advisors had intentionally manipulated the financial data and operating projections, resulting in a lower valuation for the business. The bankruptcy court conducted a five-day evidentiary hearing on the issue. Afterwards, the bankruptcy court rejected the BT Committee's proposed plan and its $630 million valuation of National Gypsum, citing problems with the valuation method and certain creditors' lack of acceptance of the proposed plan. The bankruptcy court informed the parties that it gave greater weight to National Gypsum's valuation and would approve its plan. Thereafter, the court entered an order (the "confirmation order") confirming the reorganization plan proposed by National Gypsum based on a value of $350 million on the effective date. Although the bankruptcy court's confirmation order was entered on March 9, 1993, the bankruptcy proceedings did not end until July 9, 1993, at which time the bankruptcy court declared that the reorganization plan had an effective date of July 1, 1993.

One provision of the plan and confirmation order at issue in this case is referred to as "the fee-shifting provision." It provides that, in any lawsuit challenging the good faith of certain parties, including New NGC, the Officers and Directors of National Gypsum [11] and their financial ad-

---

**10.** The warrants would entitle the holders to buy approximately nine million shares of the new company at an exercise price of $2.74, and were exercisable from three to eight years after effective date. The warrants also had anti-dilution provisions.

**11.** These parties, or their successors in interest, are appellees Peter C. Browning, Allan V. Cecil, Edward A. Porter, Kathleen M. Prokay, in her capacity as Executrix of the Estate of

Robert M. Prokay, Autino O. Maraia, Gerard P. Carroll, Kenneth L. Block, Charles J. Cella, John P. Hayes, James B. Henderson, Bernard L. Kasriel, Barbara McFadin Bishop, in her capacity as Co–Executrix of the Estate of Robert L. McFadin, Linda McFadin Spake, in her capacity as Co–Executrix of the Estate of Robert L. McFadin, Christa A. Overcash, in her capacity as Independent Executrix of the Estate of Reece A. Overcash, Jr., and Cynthia A. Hartley. We note that some of these parties

visors, for certain actions taken during the bankruptcy, the losing party will be liable for the winning party's reasonable attorneys' fees and costs. As a condition to continuing such litigation, the fee-shifting provision also requires all parties to provide adequate assurance that they will be able to pay those fees if they do not prevail in the litigation.

Pursuant to the confirmed reorganization plan, the Senior Bondholders received approximately 85% of the stock in New NGC in exchange for their National Gypsum indebtedness. Thus, the Senior Bondholders stood to receive a windfall if the value of New NGC was substantially higher than claimed in the National Gypsum plan. The Junior Bondholders' debt was exchanged for approximately two million warrants for New NGC stock, about 10% of the company, exercisable at $14.50 per share. Thus, according to the Junior Bondholders, the $537 million debt owed to them was to be wiped out for less than $30 million.

A party may appeal from an order confirming a reorganization plan within ten days of its entry. *See* FED. R. BANKR.P. 8002(a). Either no party appealed the confirmation order, or any such appeal was subsequently dismissed. Additionally, an interested party may contest a bankruptcy confirmation order on the basis that it was procured by fraud within 180 days after its entry. *See* 11 U.S.C. § 1144 (1993). However, no interested party requested the bankruptcy court to set aside the confirmation order based on fraud. The 180-day period under section 1144 expired on September 9, 1993. Approximately one month later, on October 5, 1993, New NGC announced a new cost-savings plan for the business that allegedly resulted in an annual reduction of $30 to $40 million in selling, general, and administrative expenses.

## C. Appellants' Claims

Briefly stated, appellants allege that during the course of the bankruptcy proceeding, the Senior Bondholders, the Officers and Directors of National Gypsum (many of whom became the officers and directors of New NGC), and their respective financial advisors,[12] intentionally undervalued National Gypsum by concealing a plan to dramatically reduce the company's operating expenses—a plan allegedly devised in secret by National Gypsum's consultant while National Gypsum was acting as debtor-in-possession in the bankruptcy. Appellants allege that the Officers and Directors received secret, lucrative compensation packages for going along with the strategy to conceal the cost-savings plan.[13] Then, after the company emerged from bankruptcy as New NGC (and after the 180 day deadline for setting aside a confirmation order for fraud had passed), the plan to reduce the operating expenses was publicly announced and implemented.

More specifically, appellants allege appellees represented to the bankruptcy court and to them that the reorganized National Gypsum, with expenses "cut to the bone," was worth only between $300 and $375 million. Appellants assert, however, that during this same time period appellees were fully aware of a cost-sav-

---

have settled claims by and against them. *See infra* fn. 29.

**12.** DLJ, National Gypsum's financial advisor, and Houlihan Lokey, the Senior Bondholders' expert on valuation issues.

**13.** Appellants also allege that the Officers and Directors received significant stock options and financial incentives to participate in the plan and thus realized large profits from the increased value of New NGC.

ings plan authored by Harry Leonhardt, a consultant hired by National Gypsum, which would involve a small investment in computerization and result in a drastic reduction in workforce. When implemented, this plan resulted in annual expense savings of $30 to $40 million, five to eight times the expense savings estimated in the BT Committee proposed plan. Appellants claim appellees concealed not only the cost-savings plan, but the fact that National Gypsum had hired consultants to come up with the plan, until the bankruptcy was final and the confirmation order could not be revoked.

Appellants contend that after the cost-savings plan was announced and implemented, New NGC's stock price rose from about $12.50 per share to $45 per share, and ultimately reached $54 per share before New NGC was taken private in April 1995. Appellants allege that the announcement and execution of the previously undisclosed cost-savings plan resulted in an increase in the market value of New NGC's outstanding stock from $350 million to almost $1 billion.

Because the Senior Bondholders' debt against National Gypsum had been exchanged for New NGC stock pursuant to the reorganization plan, the increased valuation of New NGC resulting from the cost-savings plan increased the values of their investments by substantial amounts, far in excess of their original debt. For example, it is alleged that on an investment of approximately $40 million, the TCW creditors made a gross return of $140.9 million, and on an investment of

approximately $38.1 million, Water Street made a gross return of $101 million. In contrast, the Junior Bondholders' debt securities had been exchanged for a limited number of warrants in the new company.[14] Thus, the Junior Bondholders allege they were unable to (and, were specifically and deliberately excluded from being able to) proportionally benefit from the increased value of New NGC's stock resulting from management's implementation of the cost-savings plan. Likewise, the Asbestos Claimants allege the intentional undervaluation of National Gypsum resulted in the Trust being funded with substantially less money than it otherwise would have, to the detriment of those having asbestos-related claims against National Gypsum.

According to appellants, the purpose of appellees' activities was to keep the stated valuation of National Gypsum as low as possible until after the company emerged from bankruptcy, allowing the Senior Bondholders to avoid sharing with competing creditors (such as the Junior Bondholders and the Asbestos Claimants) as much of the National Gypsum "pie" as they would have otherwise.[15] By cooperating in the plan, the Officers and Directors allegedly benefitted by maintaining their positions in New NGC and by receiving the lucrative incentive deals.

### D. Litigation History

The parties have litigated disputes relating to the National Gypsum bankruptcy in a number of different proceedings, some of which took place simultaneously. We

14. Pursuant to the confirmed reorganization plan, New NGC issued warrants to the Junior Bondholders for approximately 2.184 million shares exercisable at $14.50 per share.

15. Under the proposed BT Committee plan, the Junior Bondholders would have received warrants for significantly more shares of stock at a lower exercise price, although with

a three-year holding period. The BT Committee plan would have given the Junior Bondholders warrants for approximately 9 million shares in the new company (about 45% of the stock) exercisable at $2.74 per share, and exercisable from three years to eight years after the effective date.

summarize the significant litigation as follows.

### 1. Current Case

The current case was filed in state court on October 5, 1995, by appellant Prostok [16] on behalf of himself and all others similarly situated (i.e. the Junior Bondholders), against the Officers and Directors, DLJ, and later the TCW Parties,[17] based upon their alleged actions in intentionally concealing the cost-savings plan and leading the bankruptcy court to undervalue National Gypsum. The defendants removed the case to federal district court on November 15, 1995. The federal district court referred the case to the bankruptcy court, where it was assigned Adversary No. 395–3612 in the National Gypsum bankruptcy case. On March 26, 1996, the bankruptcy court remanded the case to state court for lack of federal jurisdiction. The remand order was affirmed by the federal district court on February 21, 1997.

Following the remand to state court, on June 10, 1998, Prostok filed his Third Amended Original Petition, adding the TCW Parties as defendants. Prostok did not (and does not) allege any claims against the other Senior Bondholders or their financial advisor, Houlihan Lokey. Prostok alleged claims for:

(1) breach of fiduciary duty against the Officers and Directors, DLJ, and the TCW Parties;

(2) participating, aiding, assisting, and/or inducing breach of fiduciary duties against DLJ and the TCW Parties;

(3) fraud and constructive fraud against the Officers and Directors, DLJ, and the TCW Parties;

(4) gross negligence against the Officers and Directors and DLJ; and

(5) civil conspiracy against the Officers and Directors, DLJ, and the TCW Parties.

On March 30, 1998, New NGC intervened in this action. On July 24, 1998, New NGC joined the trustees of the Trust as "involuntary plaintiffs." New NGC alleged that under the terms of the confirmed reorganization plan, the claims asserted by Prostok in this case (and similar claims the Asbestos Claimants had asserted in other courts) [18] were in fact owned by New NGC. Thus, New NGC alleged appellants lacked standing to bring those claims, and sought a declaratory judgment to that effect. New NGC also alleged the provisions of the reorganization plan precluded appellants' claims. In a later pleading, New NGC alternatively asserted that the plan's fee-shifting provision required appellants, as a condition to continuing the suit, to prove their ability to pay the reasonable attorneys' fees and costs of New NGC, the Officers and Directors, and DLJ in successfully defending the suit. The Officers and Directors and DLJ also filed counterclaims against appellants under the fee-shifting provision.

On August 28, 1998, the Trust filed its claims in this action [19] against the Officers and Directors, DLJ, and the TCW Parties. The Trust also joined as additional defendants the other Senior Bondholders (Water Street and Fidelity Management) and

---

**16.** Appellants Jackie Field, Jr. and Alfred Earnest were later added as plaintiffs and additional class representatives. The certification of the class of junior bondholders is not before us.

**17.** Prostok added the TCW Parties as defendants on June 10, 1998.

**18.** *See infra* p. 893.

**19.** On October 6, 1997, the Trust had filed these claims in the bankruptcy court in adversary no. 397–3454. *See infra* p. 894.

Houlihan Lokey, none of which had been parties to Prostok's suit.

The Trust asserted claims of fraud, breach of fiduciary duties, misrepresentation, gross negligence, civil conspiracy, and aiding and abetting the breach of fiduciary duties by others (i.e. the Officers and Directors) during and after the bankruptcy proceedings. Initially, the Trust alleged both a direct fiduciary duty with the Officers and Directors, DLJ, and the Senior Bondholders and Houlihan Lokey, and a conspiracy between these defendants to aid and encourage the fraud and breach of fiduciary duty by the Officers and Directors. In a later supplemental pleading, the Trust added an allegation of aiding and abetting a breach of fiduciary duty against the Senior Bondholders and Houlihan Lokey. On December 2, 1998, the Legal Representative and the School District parties intervened and adopted the Trust's pleadings.

Appellees filed a series of motions for summary judgment. The Officers and Directors, DLJ, and New NGC filed a motion for summary judgment asserting the Asbestos Claimants lacked standing to bring the claims asserted in this action.[20] All appellees then joined in a motion for summary judgment asserting that appellants' respective claims against them did not exist under Texas law. (This was the only motion for summary judgment asserted by the Officers and Directors against Prostok.) Specifically, this motion argued that: Texas law does not recognize claims for

perjury or spoliation; plaintiffs' claims were barred by Bankruptcy Code section 1144; plaintiffs' claims failed because they relied on an inapplicable fraud on the market theory; the bankruptcy court judgment could not be attacked in state court; and plaintiffs' conspiracy claims failed because there was no underlying tort.

The TCW Parties (except for TCW Group, Inc.)[21] also filed a separate supplemental motion for summary judgment against Prostok. (The TCW Parties were the only Senior Bondholders sued by Prostok.) This motion sought summary judgment on the grounds of limitations, res judicata and collateral estoppel, and the absence of a fiduciary duty.

The Senior Bondholders and Houlihan Lokey also filed a supplemental motion for summary judgment against the Asbestos Claimants. This motion asserted that: the Asbestos Claimants' claims were barred by the applicable statute of limitations, res judicata, and collateral estoppel; they owed no fiduciary duty to the Asbestos Claimants; and that the Asbestos Claimants lacked standing to assert their claims.

On March 1, 1999, the trial court denied the motions for summary judgment based on no-evidence and statute of limitations grounds. However, it granted summary judgment against Prostok's and the Asbestos Claimants' claims in all other respects, without stating the specific grounds.[22]

Prostok and the Asbestos Claimants then moved for summary judgment on New NGC's cross-claim and the counter-

---

20. DLJ also filed a no-evidence motion for summary judgment and a motion for summary judgment asserting that its fee award in the National Gypsum bankruptcy proceeding precluded the claims against it.

21. TCW Group Inc. had entered a special appearance contesting personal jurisdiction, and thus did not join this summary judgment motion.

22. After the trial court entered this order, TCW Group, Inc. filed a motion for summary judgment asserting the same grounds previously argued by the other TCW Parties. On April 21, 1999, the trial court granted TCW Group, Inc.'s motion for summary judgment in part and denied it in part on the same basis as stated in its March 1, 1999 order.

claims of the Officers and Directors and DLJ.[23] (These claims sought to enforce the fee-shifting provision of the bankruptcy plan.)[24]

On April 21, 1999, the trial court signed a final judgment addressing all remaining claims in the suit. The judgment granted appellants' motions for summary judgment on the claims based on the fee-shifting provision and, on the court's own motion, dismissed as moot New NGC's intervention asserting its ownership of the claims. The judgment addressed all remaining claims, denied all other relief, and stated it was a final judgment. Thus, the March 1, 1999, interlocutory order on the appellees' motions for summary judgment merged into this final judgment,[25] which is the judgment on appeal before us.

2. Federal Declaratory Judgment Actions

On October 17, 1995, Prostok filed a declaratory judgment action in the bankruptcy court against the Officers & Directors and DLJ, seeking a determination that the fee-shifting provision in National Gypsum's plan of reorganization did not apply to Prostok's state court class action. This matter was docketed within the bankruptcy proceeding as Adversary No. 395–3477. New NGC intervened in the adversary proceeding as an additional defendant and moved to dismiss the complaint. The defendant/intervenors also asserted counterclaims seeking a declaratory judgment that Prostok's state court lawsuit was barred because of various preclusion defenses.

The fee-shifting provision was part of a paragraph in the reorganization plan providing that if certain parties, including the officers, directors, and financial advisors of New NGC, National Gypsum, and other entities, acted in good faith during the bankruptcy proceedings, they would not be liable for any actions or inactions in connection with operating the debtor, implementing the transactions contemplated by the plan, or administering the plan, except for willful misconduct or gross negligence. The fee-shifting provision states in relevant part,

> In any action, suit or proceeding by any Claimant, Interestholder or other party in interest contesting any action by, or non-action of, Debtors, Reorganized NGC, New NGC, ... or their respective ... officers, directors, ... [and] financial advisors, ... as not being in good faith, the reasonable attorneys' fees and costs of the prevailing party shall be paid by the losing party and as a condition to going forward with such action, suit, or proceeding at the outset thereof, all parties thereto shall be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail.

On cross-motions for summary judgment, the bankruptcy court held the fee-shifting and other provisions of the reorganization plan were final orders not subject to modification, but declined to exercise its

---

**23.** Prostok's motion was only directed at the counterclaims of the Officers and Directors and DLJ.

**24.** As discussed in the next section, the bankruptcy court had ruled that the fee-shifting provision did not apply to this litigation, and appellants asserted this ruling barred claims based on the fee-shifting provision under the

doctrines of res judicata and collateral estoppel.

**25.** *See Webb v. Jorns,* 488 S.W.2d 407, 408–09 (Tex.1972) (trial court's interlocutory judgment merges into final judgment, and thus becomes final for purposes of appeal, whether or not it is specifically named within the final judgment).

discretion to decide the declaratory judgment questions, deferring instead to the state court. On appeal, the federal district court affirmed the finality of the fee-shifting and other provisions of the plan, but reversed the bankruptcy court's decision to not rule on the declaratory judgment action and counterclaims, and remanded the case to the bankruptcy court for further consideration.

After the remand, the Asbestos Claimants (which were not parties to Adversary No. 395–3477) filed a motion in the main National Gypsum bankruptcy case challenging whether the fee-shifting provision applied to a similar lawsuit that they were contemplating.[26] Thereafter, the bankruptcy court disposed of both Prostok's declaratory judgment action (Adversary No. 395–3477) and the Asbestos Claimants' motion in the main bankruptcy case in an order entitled "Memorandum Opinion and Orders," dated January 21, 1998 and filed January 26, 1998 (the "January 21, 1998 Order").

In general, the bankruptcy court held the fee-shifting provision was final and binding on Prostok and the Asbestos Claimants, but that it may have been entered in error and therefore should be strictly construed. The bankruptcy court concluded that the release provision in the first part of the paragraph was a limitation on the scope of the fee-shifting provision at the end of the paragraph. The bankruptcy court also concluded that the fee-shifting provision may violate public policy. Thus, the court held that the fee-shifting provision, although final, did not apply to "claims based on gross negligence or willful misconduct relating to the confirmation process," such as those brought by Prostok (in the state court lawsuit) or by the Asbestos Claimants (in Adversary No. 397–3454).

The bankruptcy court also considered the declaratory judgment counterclaims and denied the defendants' motions for summary judgment seeking to bar Prostok's claims on the grounds of res judicata and collateral estoppel. On May 8, 1998, the bankruptcy court entered a final judgment in the Prostok declaratory judgment adversary proceeding (Adversary No. 395–3477). It held, based on the January 21, 1998 Order, that the fee-shifting provision did not apply to Prostok's state court suit and granted him relief from any bankruptcy injunctions against suit. The court abstained from further consideration of the counterclaims raising res judicata and collateral estoppel defenses and administratively closed the case. Thus, the January 21, 1998 Order was subsumed into and confirmed by the May 8, 1998 final judgment.

The Officers and Directors, DLJ, and New NGC appealed the May 8, 1998 judgment's and the January 21, 1998 Order's determination the fee-shifting provision did not apply to Prostok and the Asbestos Claimants to the district court.[27] The federal district court reversed in part the bankruptcy court's May 8, 1998 judgment and January 21, 1998 Order. *See Nat'l*

---

26. The Asbestos Claimants later filed their own adversary proceeding against the Officers and Directors, DLJ, the Senior Bondholders and Houlihan Lokey. In this adversary proceeding, docketed as Adversary No. 397–3454, the Asbestos Claimants asserted claims similar to those asserted by Prostok's state court action. The Asbestos Claimants also alleged the fee-shifting provision did not apply to their claims. The bankruptcy court later abstained from hearing the adversary case and administratively closed the proceeding. *See infra* p. 894.

27. These parties did not appeal the bankruptcy court's decision to abstain from further consideration of the res judicata and collateral estoppel counterclaims.

*Gypsum Co. v. Prostok*, No. 3:98CV0869P, 2000 WL 1499345 (N.D.Tex. Oct. 5, 2000), *aff'd*, —— F.3d ——, No. 00–11097, 2002 WL 1397140 (5th Cir. June 14, 2002) (unpublished table decision). The district court held that the bankruptcy court construed the fee-shifting provision too narrowly, and reversed the January 21, 1998 Order to the extent it held that Prostok and the Asbestos Claimants did not have to comply with the fee-shifting provision. *Id.* at *22–*23. The district court found the fee-shifting provision was distinct from the release provision. If a claim was not released because it involved "willful misconduct, gross negligence or other bad faith actions (i.e. actions challenging good faith), then the challenging party must post a bond and be subject to fee shifting to pursue that claim." *Id.* at *20. In response to arguments by DLJ that express findings of good faith in the confirmation order precluded the type of bad faith claims raised by appellants, the district court concluded the fee-shifting provision allowed lawsuits challenging the good faith of the protected parties and thus constituted an exception to the good faith findings in the other provisions of the confirmation order. *Id.* at *24.

Prostok and the Asbestos Claimants then appealed the district court's decision to the Fifth Circuit. The Fifth Circuit held that the fee-shifting provision was basically a contract, that it did not violate public policy, and that the bankruptcy court erred in construing the provision too narrowly. *Nat'l Gypsum Co. v. Prostok (In re Nat'l Gypsum Co.)*, —— F.3d ——, No. 00–11097, 2002 WL 1397140, slip op. at 13–14 (5th Cir. June 14, 2002) (unpublished table decision). The Fifth Circuit found

that the fee-shifting provision applied to any suit by a claimant contesting any action or inaction by the protected parties as not being in good faith. *Id.* at 14–15. The court then concluded that Prostok's and the Asbestos Claimants' suits fell within the scope of the fee-shifting provision and affirmed the decision of the district court. *Id.* at 20.[28]

### 3. The Trust Litigation

On October 6, 1997, in Adversary No. 397–3454 (described earlier), the Trust first brought its claims against the Officers and Directors, DLJ, the Senior Bondholders, and Houlihan Lokey. The Trust's complaint was almost identical to Prostok's petition in state court and alleged the Trust suffered damages as a result of the intentional undervaluation of National Gypsum. On motion of the Officers and Directors, the bankruptcy court abstained from considering the claims and administratively closed the adversary proceeding without making any determinations on its merits. The Trust later filed a similar suit against the same parties in the 128th District Court of Orange County, Texas. That suit was removed to federal court in the Eastern District of Texas and docketed as Civil Action No. 1:98CV1671. That suit was dismissed after the Trust had asserted its claims in the suit now pending before us.

### E. Partial Settlements

After the final judgment entered in this case was appealed, several of the parties settled their claims against each other. DLJ and a number of the Officers and Directors settled their disputes with appellants; accordingly, all claims asserted against and by DLJ and by and against

---

**28.** We note both the October 5, 2000 order of the federal district court and the June 14, 2002 decision of the Fifth Circuit Court of Appeals were entered after the trial court

rendered judgment in the case before us, and thus were not before the trial court when it entered the final judgment in this case.

the settling Officers and Directors [29] have been severed [30] from this appeal and remanded to the trial court to permit it to effectuate their respective settlements. Thus, we do not discuss those claims further. (For clarity, future references to the "Officers and Directors" in this opinion refer to only those Officers and Directors who have not settled.)

Additionally, all of the Asbestos Claimants reached a potential settlement of their claims with the remaining defendants in this case and New NGC, and all claims asserted by and against the Asbestos Claimants have been severed from this appeal and abated.[31] Thus, the only remaining parties on this appeal are Prostok, the Officers and Directors, the TCW Parties, and New NGC.

## F. Issues on Appeal

Prostok's sole issue on appeal is whether the trial court erred in granting the Officers' and Directors' and the TCW Parties' motions for summary judgment against the Junior Bondholders.[32] In the context of this *Malooly* issue, Prostok argues the trial court erred in granting summary judgment against the Junior Bondholders' claims on the grounds that the claims:

(1) were barred by section 1144 of the Bankruptcy Code;

(2) were barred as a collateral attack;

(3) against the TCW Parties were barred by claim preclusion and issue preclusion, also known as res judica-

ta and collateral estoppel, respectively;

(4) as asserted indicated that the TCW Parties did not owe the Junior Bondholders a duty;

(5) alleged claims only for spoliation of evidence and perjury, which are not recognized under Texas law; and

(6) depended on a non-applicable "fraud on the market" theory.

On cross-appeal, the TCW Parties argue that Prostok's claims against them are barred by limitations and that the trial court erred in denying their motions for summary judgment on this ground. New NGC also cross-appealed, complaining the trial court erred in dismissing its intervention, which asserted it was the true owner of the causes of action asserted by Prostok and the Asbestos Claimants. New NGC also complains the trial court erred in granting summary judgment against it on its cross-claims for attorneys' fees under the fee-shifting provisions of the reorganization plan. The Officers and Directors joined New NGC's cross-appeal on their fee-shifting counterclaim.

## III. LIMITATIONS CROSS-POINT

We begin with the TCW Parties' cross-point concerning limitations. The trial court specifically denied the TCW Parties' motion for summary judgment against Prostok on the statute of limitations affirmative defense. On cross-appeal, the TCW Parties assert the trial court erred in denying summary judgment on this

**29.** The settling Officers and Directors are appellees Allan V. Cecil, John P. Hayes, James B. Henderson, Charles J. Cella, Kenneth L. Block, Kathleen M. Prokay, Lindsay McFaddin Spake, Barbara McFaddin, and Christa A. Overcash.

**30.** The claims by and against DLJ were severed and assigned cause number 05–01–01728–CV on November 2, 2001. The claims by and against the settling Officers and Di-

rectors were severed and assigned cause number 05–02–01042–CV on July 5, 2002.

**31.** The claims by and against the Asbestos Claimants were severed and assigned cause number 05–03–00432–CV on March 26, 2003.

**32.** *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970).

ground because all of Prostok's claims against them are barred by limitations. Even though the trial court rejected this ground, we consider whether the summary judgment on Prostok's claims against the TCW Parties can be sustained on this basis. *See Cincinnati Life Ins. Co.*, 927 S.W.2d at 626.

The following dates are relevant to the statute of limitations analysis:

- March 9, 1993—Date of order confirming reorganization plan.
- October 5, 1993—Public announcement of cost-savings plan.
- October 10, 1993 (approximate)—attorney contacts Prostok about a "good lawsuit."
- January/February 1994—National news articles reporting allegations the Senior Bondholders bribed management to withhold cost-savings plan.
- October 5, 1995—Prostok files suit against the Officers and Directors and DLJ in Texas court.
- June 10, 1998—Prostok files Third Amended Petition, adding TCW Parties as defendants for the first time, and asserting breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, fraud and constructive fraud, and civil conspiracy.

## A. The TCW Parties' Arguments

The TCW Parties argue Prostok's claims are barred by the two and four-year statutes of limitations. They assert Prostok's claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and conspiracy are all governed by the two-year statute, and that the fraud claim is governed by the four-year statute.

They argue Prostok's alleged causes of action against them accrued when the bankruptcy court confirmed the plan of reorganization on March 9, 1993, because that court rejected similar claims of fraud. Alternatively, they claim those causes of action accrued on October 5, 1993, when New NGC publicly announced the cost-savings plan. They also note that allegations about the TCW Parties' inducing management to conceal the cost-savings plan were made in the national press in February 1994. The TCW Parties recognize that the discovery rule applies to these causes of action, but argue that the summary judgment evidence conclusively proved Prostok discovered or should have discovered his injuries more than four years before he sued the TCW Parties.[33]

## B. Prostok's Arguments

Prostok and the Junior Bondholders argue the trial court properly refused to grant summary judgment in favor of the TCW Parties because they failed to carry their summary judgment burden to conclusively establish the limitations defense. Prostok argues that the four-year statute of limitations applies to all of his claims against the TCW Parties. He argues that because the discovery rule applies in this case, the TCW Parties had the burden to prove as a matter of law when each of the class members discovered or should have discovered the alleged fraud.

Prostok alleged he could not have discovered the facts giving rise to his claim against the TCW Parties until May 1998. Prostok argues his causes of action did not accrue on March 9, 1993 (the date of the confirmation order) because the allegations of fraud and breach of fiduciary duty made

---

**33.** They also argue Prostok must have known of his injury when he first sued the Officers and Directors and DLJ, and thus any claims against the TCW Parties governed by the two-year statute are barred because Prostok did not sue them within two years of the date of his original suit.

in the bankruptcy proceeding relate to entirely different events than those giving rise to his causes of action asserted here. He claims the allegations raised in the bankruptcy proceeding related to events taking place in 1991 and 1992; in contrast, he says, the allegations asserted against the TCW Parties in this case arise from entirely different events, namely: devising and concealing the cost-savings plan, which was not announced until October 1993. Further, with respect to October 5, 1993 (the date the cost-savings plan was announced), Prostok argues the TCW Parties failed to prove that any class members actually were or should have been aware of the announcement before June 10, 1994, and that they should have discovered TCW's fraud as a result. In response to whether his causes of action accrued in February 1994 (when the New York Times printed an article raising the possibility of fraud by the TCW Parties and the other Senior Bondholders), Prostok argues the evidence of the news articles did not satisfy the TCW Parties' summary judgment burden because the TCW Parties did not show that any class member read the articles and that the articles put them on notice of a possible fraud claim. Finally, Prostok argues that his claims against the TCW Parties are not barred because he asserted those claims against them within four years of filing his original suit.

## C. Analysis

■ A cause of action generally accrues when a wrongful act causes some legal injury to the plaintiff, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex.1997); *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex.1996). However, a limited exception to this general rule exists, called the "discovery rule." *Murphy*, 964 S.W.2d at 270. Where applicable, the

discovery rule defers the accrual of a cause of action until the plaintiff knows or, in the exercise of reasonable diligence, should have known of the wrongfully caused injury. *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 735 (Tex.2001). The plaintiff need not know the specific nature of each wrongful act that may have caused the injury for his cause of action to accrue under the discovery rule. *Id.* Rather, it accrues when the plaintiff discovers or, in the exercise of reasonable diligence, should discover the "nature of his injury." *Childs v. Haussecker*, 974 S.W.2d 31, 40 (Tex. 1998). Thus, the discovery rule only defers accrual of a cause of action until the plaintiff discovered, or should have discovered through reasonable diligence, the injury and that it was likely caused by the wrongful acts of another. *Id.* (citing *S.V.*, 933 S.W.2d at 4). Once these requirements are satisfied, "limitations commences, *even if the plaintiff does not know the exact identity of the wrongdoer.*" *Id.* (emphasis added).

■ The discovery rule applies only when the nature of the plaintiff's injury is inherently undiscoverable and objectively verifiable, *Wagner & Brown, Ltd.*, 58 S.W.3d at 735, and in cases of fraud and fraudulent concealment. *Computer Associates Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996) (reason for applying discovery rule in situations of fraud or fraudulent concealment resembles concept of equitable estoppel, and differs from reasons for applying discovery rule in other contexts). The discovery rule also applies to claims of breach of fiduciary duty and conspiracy. *See Altai*, 918 S.W.2d at 456 (in a fiduciary context, the nature of the injury is presumed to be inherently undiscoverable); *In re Estate of Herring*, 970 S.W.2d 583, 586 (Tex.App.-Corpus Christi 1998, no pet.) (discovery rule applies to conspiracy to commit fraud); *Cathey v.*

*First City Bank of Aransas Pass*, 758 S.W.2d 818, 822 n. 3 (Tex.App.-Corpus Christi 1988, writ denied) (same). *See also Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex.1988) (discovery rule applies in legal malpractice cases because of the fiduciary relationship between attorney and client).

▌ A defendant moving for summary judgment on the grounds that the claim asserted is barred by limitations must conclusively prove all the elements of that affirmative defense. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). This requires proof of the date the cause of action accrued and the applicable statute of limitations. A party relying on the discovery rule to avoid the bar of limitations must plead the rule or raise it in response to the assertion of limitations. *KPMG*, 988 S.W.2d at 748; *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex.1988). Where the discovery rule applies and has been raised by the plaintiff, as in this case, the defendant bears the burden of negating the discovery rule's application on summary judgment. *KPMG*, 988 S.W.2d at 748. The defendant may do so by proving there is no genuine issue of material fact about when the plaintiff discovered or should have discovered the nature of the injury. *Id.*[34]

▌ Applying these principles, we examine the record to determine whether the TCW Parties conclusively established that Prostok did not sue them within the applicable period after the date Prostok discovered or should have discovered the "nature of his injuries." *See Childs*, 974 S.W.2d at 40. It is undisputed Prostok, on behalf of the Junior Bondholders, sued the TCW Parties on June 10, 1998. Thus, and assuming for purposes of argument that the four-year limitation period applies to Prostok's claims (as he asserts), we consider whether the record conclusively established that Prostok acquired or, in the exercise of reasonable diligence, should have acquired "knowledge of the wrongful act[s] and the resulting injur[ies]" that form the basis of his claims before June 10, 1994. *See id.*

The TCW Parties' arguments urge three alternate dates (all of which predate June 10, 1994) on which Prostok's claims allegedly accrued: March 9, 1993, the date of the confirmation order; October 5, 1993, the date the cost-savings plan was announced; or some date in January/February 1994, when the national press published allegations that the TCW Parties and the other Senior Bondholders had induced management to delay the planned price increases and workforce reductions until after the bankruptcy plan was implemented. We begin by reviewing the record with respect to this last approximate date.

---

**34.** Prostok also pleaded fraudulent concealment in response to the TCW Parties' motion for summary judgment. Where they apply, both the discovery rule and fraudulent concealment have the same effect—the limitations period does not begin to run until the claimant, using reasonable diligence, discovered or should have discovered the nature of its injury. *See KPMG*, 988 S.W.2d at 750; *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex.1997). In other words, fraudulent concealment does not extend limitations beyond the application of the discovery rule. *See Arabian Shield Dev. Co. v. Hunt*, 808 S.W.2d 577, 584–85 (Tex.App.-Dallas 1991, writ denied). However, if the plaintiff relies on the doctrine of fraudulent concealment to avoid limitations, the plaintiff has the burden to raise a fact issue on all elements of the doctrine in order to defeat summary judgment. *KPMG*, 988 S.W.2d at 749; *Gibson v. Ellis*, 58 S.W.3d 818, 824 (Tex.App.-Dallas 2001, no pet.).

Because the discovery rule applies to Prostok's alleged causes of action, and because Prostok does not brief this point on appeal, we do not separately address Prostok's fraudulent concealment argument.

The cost-savings plan was publicly announced in October of 1993, and was widely reported in the financial press. The record contains evidence that in February 1994, the New York Times quoted the lead attorney for the BT Committee as saying about National Gypsum, "the company was essentially saying to its senior bondholders, 'We will give you the benefit of undervaluation if you give us employment contracts.'" Alison Leigh Cowan, *Beware Management Talking Poor*, N.Y. TIMES, Feb. 13, 1994, § 3, at 13. In another article, the same attorney claimed National Gypsum withheld the plans for the layoffs from the bankruptcy court, "You'll never convince me that the company didn't know it could increase its earnings by $30 million a year by cutting 12% of its work force." Kelly Greene, *Stock Soars as Some Sour on Settlement*, BUS. J. OF CHARLOTTE, Feb. 21, 1994, § 1, at 1. Charlotte, North Carolina, is the home base of New NGC. A similar article was published in Forbes magazine on January 31, 1994. Thus, by the end of February 1994, New NGC's cost-savings plan had been announced and one of the lead attorneys for the BT Committee had publicly accused National Gypsum's management and the holders of its senior indebtedness of misconduct in concealing the plan during the bankruptcy proceedings.

In the exercise of reasonable diligence, Prostok and the Junior Bondholders should have been aware of these reports. The Junior Bondholders had reason to diligently follow the news of New NGC after the bankruptcy case. They had received warrants for New NGC stock in exchange for their bonds under the confirmed plan of reorganization. They had a keen interest in deciding when to exercise those warrants to maximize the return on their original investment. In this case, it would be reasonable to expect the Junior Bondholders to monitor news reports about New NGC in the financial press. Had they done so, they would have discovered information, such as the information contained in the articles just discussed, that at a minimum would have led a prudent person to make an inquiry leading to discovery of a cause of action. *Hoover v. Gregory*, 835 S.W.2d 668, 671 (Tex.App.-Dallas 1992, writ denied) (discovery occurs when plaintiff has knowledge of facts that would cause a reasonably prudent person to make inquiry that would lead to discovery of cause of action).

In addition, the TCW Parties produced evidence linking the class representative, Prostok, to knowledge of the cost-savings plan's announcement and the news articles. One of Prostok's current attorneys, who was also one of the attorneys for the BT Committee in the bankruptcy, testified in deposition that he first discussed with Prostok the possibility of a lawsuit against National Gypsum's management or others within days of the October 1993 public announcement of the cost-savings plan.

The above evidence in the record, taken together, established that Prostok and the Junior Bondholders discovered, or in the exercise of reasonable diligence, should have discovered the nature of their injuries and that they were caused by the wrongful acts of another by no later than February 1994. Thus, limitations began to run from this date even if Prostok and the Junior Bondholders did not know the exact identity of the alleged wrongdoers. *See Childs*, 974 S.W.2d at 40. However, Prostok did not file suit on behalf of the Junior Bondholders against the TCW Parties until June 10, 1998, more than four years after the October 1993 announcement and the February 1994 news articles.

Prostok alleged four causes of action against the TCW Parties: breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, and conspiracy.

At the time these causes of action accrued and were filed against the TCW Parties, the courts of appeal were split on whether the two-year [35] or four-year [36] statute of limitations applied to claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty.[37] Fraud is governed by a four-year statute of limitations, *Williams v. Khalaf,* 802 S.W.2d 651, 657 (Tex.1990), and conspiracy is governed by a two-year statute of limitations, *Cathey,* 758 S.W.2d at 822. Because limitations on all of Prostok's claims against the TCW Parties accrued more than four years before he actually sued the TCW Parties, all of Prostok's and the Junior Bondholders' causes of action against the TCW Parties are barred by limitations.[38]

■ We also reject Prostok's argument that he timely sued the TCW Parties be- cause he added them as parties within four years of filing his original suit. As dis- cussed above, Prostok and the Junior Bondholders knew or should have known of their injuries more than four years be- fore they sued the TCW Parties. Filing suit against one party does not toll limita- tions against another party. *See Cooke v. Maxam Tool and Supply, Inc.,* 854 S.W.2d 136, 139 (Tex.App.-Houston [14th Dist.] 1993, writ denied). Even so, Prostok's conspiracy claims against the TCW Parties would still be barred because those causes of action accrued, at the absolute latest, by the date he filed suit against the Officers and Directors, and he did not bring the conspiracy claims against the TCW Parties within two years of that date.

Prostok's motion for rehearing argues that the TCW Parties did not meet their

**35.** For cases applying the two-year statute of limitations: *see Maxson v. Travis County Rent Account,* 21 S.W.3d 311, 319 (Tex.App.-Austin 1999, pet. dism'd by agr.); *Farias v. Laredo Nat'l Bank,* 985 S.W.2d 465, 471 (Tex.App.- San Antonio 1998, pet. denied.); *Hendricks v. Thornton,* 973 S.W.2d 348, 364 n. 19 (Tex. App.-Beaumont 1998, pet. denied); *Smith v. Chapman,* 897 S.W.2d 399 (Tex.App.-Eastland 1995, no writ); *Smith v. Little,* 903 S.W.2d 780, 786 (Tex.App.-Dallas 1995), *aff'd in part, rev'd in part on other grounds,* 943 S.W.2d 414 (Tex.1997); *Clade v. Larsen,* 838 S.W.2d 277, 281 (Tex.App.-Dallas 1992, writ denied); *El Paso Assocs., Ltd. v. J.R. Thurman & Co.,* 786 S.W.2d 17, 20 (Tex.App.-El Paso 1990, no writ); *Russell v. Campbell,* 725 S.W.2d 739, 744 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.); *Redman Indus., Inc. v. Couch,* 613 S.W.2d 787, 789 (Tex.Civ.App.-Houston [14th Dist.] 1981, writ ref'd n.r.e.); TEX. CIV. PRAC. & REM.CODE ANN. § 16.003(a).

**36.** For cases applying a four-year statute of limitations: *see McGuire v. Kelley,* 41 S.W.3d 679, 682 (Tex.App.-Texarkana 2001, no pet.); *Chandler v. Chandler,* 991 S.W.2d 367, 394 (Tex.App.-El Paso 1999, pet. denied); *In re Estate of Herring,* 970 S.W.2d 583, 587 (Tex. App.-Corpus Christi 1998, no pet.); *Rowe v. Rowe,* 887 S.W.2d 191, 201 (Tex.App.-Fort Worth 1994, writ denied); *Perez v. Gulley,* 829 S.W.2d 388, 390 (Tex.App.-Corpus Christi 1992, writ denied); *Spangler v. Jones,* 797 S.W.2d 125, 132 (Tex.App.-Dallas 1990, writ denied) (Breach of fiduciary duty is a claim for constructive fraud and governed by four- year statute of limitations). *See also, Williams,* 802 S.W.2d at 656–57 (fraud is most analogous to an action for debt and is controlled by a four-year statute of limita- tions. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(3)).

**37.** The conflict was resolved by the Legisla- ture in 1999 when it amended the four-year statute of limitations to include claims for fraud and breach of fiduciary duty. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(4), (5) (Vernon Supp.2000). The Legislature stated, "The intent of this Act is to clarify existing law by resolving a conflict in case law con- cerning the applicable statute of limitations for actions for fraud and breach of fiduciary duty." Act of May 26, 1999, 76th Leg., R.S., ch. 950, § 2, 1999 Tex. Gen. Laws 3687.

**38.** We do not decide whether the two-year or four-year statute of limitations applied to the breach of fiduciary duty and aiding and abet- ting breach of fiduciary duty claims in this suit because the claims are barred under ei- ther statute.

summary judgment burden with respect to their statute of limitations affirmative defense. Prostok cites one case for the general proposition that when discovery occurs is generally a fact question. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1170–71 (5th Cir.1979). We question whether the case would be decided the same way under current federal summary judgment practice. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted). Moreover, its facts are distinguishable from those of the case before us. *Beef Industry* involved multi-district litigation; it was not a class action case. *Beef Industry*, 600 F.2d at 1153. That court held that, for purposes of the discovery rule, even though the plaintiffs knew or should have known, through media attention, of a lawsuit similar to the one they later brought, knowledge of the other lawsuit did not as a matter of law constitute knowledge of their own cause of action. *Id.* at 1170–71. However, here the summary judgment evidence showed Prostok and the Junior Bondholders knew or should have known of both their injury and that it was caused by the wrongful acts of another more than four years before they sued the TCW Parties. *See Childs*, 974 S.W.2d at 40.

After taking as true the summary judgment evidence favorable to Prostok and the Junior Bondholders, indulging every reasonable inference in their favor, and resolving any doubts in their favor, we conclude Prostok and the Junior Bondholders discovered, or should have discovered through reasonable diligence, the injury and that it was likely caused by the wrongful acts of another, more than four years before they sued the TCW Parties. *See Childs*, 974 S.W.2d at 40. Thus, we conclude the trial court erred in denying the TCW Parties' motions for summary judgment based on limitations. We sustain the TCW Parties' cross-point, reverse the trial court's order denying the TCW Parties' motion for summary judgment based on limitations, and render judgment in favor of the TCW Parties against Prostok. *See Cincinnati Life Ins. Co.*, 927 S.W.2d at 624–26. Because of our disposition of the TCW Parties' cross-point, we need not reach Prostok's arguments that the trial court erred in granting summary judgment on his claims against the TCW Parties on other grounds. *See* Tex.R.App. P. 47.1.

## IV. Prostok's Arguments Regarding Officers and Directors

We now look at Prostok's arguments with respect to the summary judgment granted to the Officers and Directors. In general, those arguments are that Prostok's claims are not barred by section 1144 of the bankruptcy code and are not a collateral attack on the confirmation order; the claims are not based on perjury and spoliation of evidence; the claims are not barred by a "fraud on the market" theory of reliance; and the conspiracy claim is based on underlying torts.

### A. Bankruptcy Code Section 1144 and Collateral Attack

One of the grounds for summary judgment the Officers and Directors asserted in their motions was that Prostok's claims were barred because section 1144 of the United States Bankruptcy Code provides the exclusive remedy for appellees' alleged conduct. Section 1144, entitled "Revocation of an order of confirmation," states

On request of a party in interest at any time before 180 days after the date of the entry on the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall—

(1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and

(2) revoke the discharge of the debtor.

11 U.S.C. § 1144 (1993). The Officers and Directors asserted Prostok's claims are an impermissible collateral attack on the bankruptcy court's confirmation order, and that because the 180–day deadline had expired, Prostok could no longer challenge the confirmation order.

### 1. Prostok's Arguments

Prostok contends section 1144 does not bar his claims because that section applies only to efforts to *revoke* a confirmation order, and he is *not* seeking to revoke the confirmation order. Instead, Prostok contends he is suing for common-law damages caused by alleged breaches of fiduciary duty, fraud, and related torts by the Officers and Directors, and section 1144 does not bar such a common-law suit for tort damages. Prostok's brief acknowledges a need for bankruptcy proceedings to be final in order to protect innocent parties who rely on the confirmation order when doing business with the debtor. Thus, he agrees section 1144 bars fraud actions that seek to revoke the confirmation order more than 180 days after it was entered. However, he argues neither section 1144 nor the policies underlying that provision render the Officers and Directors immune

from tort liability for common-law causes of action simply because the deadline for revoking the confirmation order has passed. If that were the case, he argues, wrongdoers in a bankruptcy proceeding would simply have to conceal their fraud successfully for 181 days, and defrauded parties would be left without any legal remedy.

Prostok also argues the very bankruptcy court that entered the confirmation order also ruled that his state court suit was not a collateral attack on any of the bankruptcy court's orders. In support of this argument, Prostok quotes the following language from bankruptcy court Judge Felsenthal's March 26, 1996 Order in Adversary No. 395–3612, which remanded the case before us to state court:

> Although bankruptcy issues will undoubtedly be implicated in the litigation, the complaint does not seek to attack or undermine an order of this court. Nor does the complaint seek to set aside a provision of a settlement in a federal bankruptcy case. Prostok does not seek relief from a federal judgment on the basis of fraud.

(citations omitted).

Prostok also argues he is not attacking the confirmation order, collaterally or otherwise. According to Prostok, a collateral attack seeks to demonstrate that the underlying judgment is void because the court lacked jurisdiction. Prostok points out, however, that he has never asserted the bankruptcy court lacked jurisdiction over the National Gypsum bankruptcy; instead, he seeks to assert state court causes of action against parties other than National Gypsum or New NGC for conduct that occurred during and after that bankruptcy.[39] Prostok stresses that he is not

---

39. In fact, Prostok stresses that, because some of the conduct complained of in this lawsuit

suing National Gypsum, the debtor in the bankruptcy proceeding.

2. The Officers' and Directors' Arguments

The Officers and Directors contend section 1144 provides the exclusive means to undermine a confirmation order allegedly procured through fraud. They argue that, although Prostok's claims are not styled in a manner that seeks directly to "revoke" the confirmation order, he is in fact attempting to "relitigate" the outcome of the bankruptcy proceeding.

According to the Officers and Directors, Congress's intent behind section 1144 was to safeguard the strong public policy favoring the finality of bankruptcy proceedings, and to hold Prostok's claims are not barred would result in the constant threat of relitigation of bankruptcy cases. In light of this policy and the "purpose and effect" of Prostok's claims, they argue the claims are barred because Prostok failed to seek relief under section 1144 within the applicable 180–day time period.

In support of their position, the Officers and Directors claim the courts of the Fifth Circuit have repeatedly barred this sort of attack on a bankruptcy plan. Further, they cite four bankruptcy court cases and argue that "overwhelming" authority elsewhere establishes that section 1144 bars fraud claims beyond 180 days of confirmation, even if the alleged fraud is not discovered until later.

Essentially, the Officers and Directors claim that a direct attack of a confirmation order under section 1144 is the exclusive means to assert claims of fraud in the context of a bankruptcy proceeding, and anything other than such a direct attack or appeal of the confirmation order consti-

allegedly occurred after the confirmation order, it could not possibly constitute a collater-

tutes an impermissible collateral attack of the bankruptcy court order. They also argue claims such as Prostok's may only be brought in a direct attack on the confirmation order filed in the same court that rendered the judgment. Thus, they argue the bankruptcy court order is not subject to attack in Texas state courts.

3. Analysis

We agree section 1144 is the exclusive remedy for *revoking* an order confirming a plan of reorganization for fraud. The statute is specific. On a proper request made within 180 days of the confirmation order, and after notice and hearing, the bankruptcy court "may revoke such order if and only if such order was procured by fraud." 11 U.S.C. § 1144. Any fraud claim seeking as a remedy the revocation of the confirmation order is barred unless it is brought within the 180–day period.

 However, revoking the order and reorganization plan is not the exclusive relief for fraud occurring in connection with the confirmation of a plan for reorganization. The courts and commentators agree that fraud may be remedied by means other than revoking the order confirming the plan of reorganization. For example, in a section entitled "Court has Power to Remedy Injustice Caused by Fraud After 180 Day Deadline," *Collier on Bankruptcy* observes:

> Even though the 180 day deadline is absolute, *a court is not without power to remedy an injustice created by a fraud in a bankruptcy case.* While the court is without power after expiration of the deadline to revoke the confirmation order, there may be other avenues to provide relief to parties affected by fraud during the chapter 11 case. The nature

al attack of the confirmation order itself.

of the relief will vary from case to case depending on the nature of the fraudulent conduct and the position of the parties to the chapter 11 case. *The most likely form the relief will take is to allow a party injured by the fraud to maintain an action for damages caused by the fraud.*

8 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 1144.04[2][a], at 1144–7—1144–8 (15th ed. rev. 2003) (citations omitted, emphasis added). Thus, the "most likely" remedy envisioned by paragraph 1144.04[2] of *Collier on Bankruptcy* is precisely the remedy Prostok seeks in this lawsuit.

Bankruptcy courts agree that section 1144 does not bar fraud claims unless those claims would require revocation of a confirmed plan. *See S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.),* 181 B.R. 457, 460 (Bkrtcy.D.Ariz.1995); *F & M Marquette Nat'l Bank v. Emmer Bros. Co. (In re Emmer Bros. Co.),* 52 B.R. 385, 392 (D.Minn.1985). The Officers and Directors respond that these two cases are not, and do not purport to be, "consistent" with the law of the Fifth Circuit, and cannot be reconciled with the overwhelming authority from other circuits. However, neither the statutory language nor the cases cited by the Officers and Directors support their expansive reading of section 1144.

Under the former Bankruptcy Act, the First Circuit recognized that the six-month limitation on seeking to revoke a plan for fraud was not the exclusive remedy for fraud. In *In re Newport Harbor Assoc.,* 589 F.2d 20, 24 (1st Cir.1978), the court found a motion seeking to revoke the plan filed three and one-half years after confirmation was three years too late. However, the court also stated that "creditors who may have been injured by fraud are [not] necessarily without other remedies in other forums.... [A]n action for damages or other relief, based on the federal securities laws or common law theories, may be available in the federal or state courts." *Id.* Following *Newport Harbor,* bankruptcy courts have allowed suits for fraud when the relief sought did not require revocation of the confirmed plan. *See, e.g., Circle K Corp.,* 181 B.R. at 460; *In re Emmer Bros. Co.,* 52 B.R. at 392.

In *Circle K Corp.,* a creditor's motion to revoke the confirmed plan for fraud was dismissed as moot because implementation of the plan had not been stayed. *In re Circle K Corp.,* 181 B.R. at 459–60. Nevertheless, the bankruptcy court concluded, "plaintiffs may proceed on a damages claim theory." *Id.* After losing on their objections to the plan and motion to revoke the plan, the creditors amended their suit against the debtor and affiliated companies to claim damages for fraud during the confirmation process. *Id.* The alleged fraud included concealment of the fact that management would have an equity interest in the reorganized debtor and false representations of the value of the company in the confirmation process. *Id.* The bankruptcy court held the amended claims were not moot and not barred by section 1144 because the creditors conceded the effectiveness of the confirmation order. *Id.* at 460. The court refused to dismiss the action under section 1144 because the remedies sought did not require revocation of the plan and the court could fashion a damage remedy if the plaintiffs were successful. *Id.* at 461.

In *In re Emmer Brothers,* a creditor with a security interest in almost all of the debtor's property agreed to take certain assets in full satisfaction of its claim and release its security interest in the remaining property. 52 B.R. at 387. The debtor then confirmed a plan to deal with the unsecured creditors. *Id.* at 388. A year

later, the secured creditor sued the debtor for misrepresentation, mutual mistake and unjust enrichment seeking damages or rescission of the settlement agreement because the debtor failed to disclose its interest in a class action lawsuit. *Id.* The district court reversed the bankruptcy court's holding the complaint was barred under section 1144. The district court noted the complaint was "not an attempt to revoke or otherwise collaterally attack the confirmation order." *Id.* at 391. The interest in the class action settlement had not been disclosed until after confirmation. As a result, the creditor could not have asserted the fraud in the bankruptcy case and the plan did not deal with this additional asset of the debtor. *Id.* at 392. A judgment concerning the money the debtor was to receive in the class action settlement would not affect the distributions to other creditors made under the plan. Thus, "this case does not involve an attempt to 'redivide the pie' by a disgruntled participant in the plan. Rather, it involves a dispute about an additional asset that did not figure into the reorganization plan." *Id.* The suit was not barred by section 1144.

We do not believe the authorities cited by the Officers and Directors stand for the proposition that section 1144 bars Prostok from asserting common-law causes of action against them in a situation such as this one, where the facts alleged were not known and could not have been discovered within 180 days after confirmation, and where the remedies sought do not require rescission or revocation of any transaction required by the confirmed plan of reorganization. One of the cases cited by the Officers and Directors in fact illustrates that section 1144 only bars claims requiring revocation of the plan. In *In re Crown–Globe, Inc.*, 107 B.R. 60, 62 (Bankr. E.D.Pa.1989), an unsecured creditor sued a secured creditor for fraud, conversion,

breach of a third-party beneficiary contract, and requested equitable subordination of the secured creditor's claim. *Id.* at 61. The court held that the equitable subordination claim would change the priority of claims paid under the debtor's confirmed plan, requiring a modification or revocation of the plan. *Id.* at 62. As a result, this claim was barred under section 1144 because it had not been filed within 180 days of confirmation. Despite this holding, however, the court allowed the fraud and other claims to proceed. *Id.* at 61.

The other bankruptcy court cases cited by the Officers and Directors are distinguishable from the present case, either because the relief requested would have required revocation of a confirmed plan or because the court was merely interpreting the provisions of the confirmed plan. *See 680 Fifth Ave. Assocs. v. EGI Co. Servs. (In re 680 Fifth Ave. Assocs.)*, 209 B.R. 314, 322–23 (Bankr.S.D.N.Y.1997) (party sought to have its proposed plan adopted because of the alleged fraud and concealment by the proponents of the successful plan); *In re Doty*, 129 B.R. 571 (Bankr. N.D.Ind.1991) (court could interpret ambiguous provisions of plan without revoking it); *In re Air One, Inc.*, 75 B.R. 1003 (Bankr.E.D.Mo.1987) (party expressly sought revocation of confirmed plan, but failed to file timely adversary proceeding to do so).

■ To be barred under section 1144, Prostok's causes of action must have sought to revoke the confirmation order. Prostok does not seek such relief; instead, he seeks money damages against non-debtors. This proposed relief is not inconsistent with the terms of the plan. Prostok does not seek to revoke the confirmed reorganization plan, rescind the new notes issued to the senior creditors, or revoke

and redistribute the shares of New NGC stock issued under the plan. Neither does he seek to revoke the Trust and the provisions relating to satisfaction of asbestos claims.

We also reject the arguments that this lawsuit is a collateral attack on the confirmation order. In Texas, "[a] collateral attack is an attempt to avoid the effect of a judgment in a proceeding brought for some other purpose." *Spera v. Fleming, Hovenkamp & Grayson, P.C.,* 25 S.W.3d 863, 870 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (quoting Gus M. Hodges, *Collateral Attacks on Judgments,* 41 TEX. L.REV. 163, 163–64 (1962)). To be effective, the collateral attack must challenge the power of the earlier court to have rendered the judgment under attack. *See Cook v. Cameron,* 733 S.W.2d 137, 140 (Tex.1987). Prostok does not seek to avoid the effect of the confirmation order. Therefore, he is not bringing a collateral attack of that order. *See Spera,* 25 S.W.3d at 870–71 (former client's malpractice and breach of fiduciary duty suit was not collateral attack on prior judgment approving the reasonableness of lawyer's contingent fee because clients did not seek to set aside earlier order on attorneys' fees).

Similarly, the Texas Supreme Court has found that where a party does not seek to set aside a prior judgment, but merely attacks conduct extrinsic to the judgment, the claim is not a collateral attack on the judgment. *State v. Durham,* 860 S.W.2d 63, 67 (Tex.1993). The court rejected the collateral attack argument:

> The State has not sought to set aside the judgment; it has alleged fraud extrinsic to the judgment, and invokes the equity powers of the court to impose a constructive trust. Consequently, the State's claim is not a collateral attack. For example, in *Dilbeck v. Blackwell,* 126 S.W.2d 760 (Tex.Civ.App.-Texarkana

1939, writ ref'd), heirs of a decedent brought suit alleging that the executor committed fraud by obtaining probate court approval of a sale to third parties, who in fact were purchasing it on behalf of the executor. The court held that the remedy of constructive trust "is authorized as relief against extraneous fraud and is not in conflict with the rule against collateral attack upon the orders of the probate court involved." *Id.* at 761; *see generally* Hodges, *Collateral Attacks on Judgments,* 41 TEX. L.J. 164, 187 (1962).

*Id.* So to, Prostok alleges fraud and breach of fiduciary duty extrinsic to the confirmation order. He seeks remedies, including damages, that do not require the setting aside of the confirmation order. Consequently, his claim is not a collateral attack.

Inherent in the Officers' and Directors' arguments regarding both section 1144 and collateral attack is the assumption that the confirmation order does not permit any challenges to the good faith of the participants in the bankruptcy proceeding. We reject this assumption. The very terms of the confirmation order expressly contemplate possible litigation contesting the good faith of several participants in the bankruptcy process. Paragraph 50 of the confirmation order, in the fee-shifting provision, anticipates and provides for suits that may be brought "contesting any action by, or non-action of, Debtors, Reorganized NGC, New NGC, ... or their respective ... officers, directors, ... [and] financial advisors, ... as not being in good faith." The confirmation order requires the losing party in such a suit to pay the prevailing party's reasonable attorneys' fees and costs, and that all parties provide proof of their ability to make those payments as a condition of going forward with the suit. Thus, the terms of the plan and the confirmation order do not prohibit

such suits. Prostok's causes of action challenge the good faith of the Officers and Directors, and are not barred by the terms of the confirmation order. Because the claims are not inconsistent with the terms of the confirmation order, they do not amount to a collateral attack on the confirmation order. Prostok, by his claims against the Officers and Directors, is not attempting to "redo" the bankruptcy or revoke the confirmation order and plan of reorganization.

We conclude Prostok's claims against the Officers and Directors are not barred by section 1144, nor do they constitute an impermissible collateral attack on the confirmation order. Thus, these grounds asserted in the motion for summary judgment will not support the trial court's judgment.

### B. Spoliation and Perjury

Another of the grounds for summary judgment the Officers and Directors asserted in their motion for summary judgment was that Prostok's claims are not recognized under Texas law. More specifically, the Officers and Directors contended there is no cause of action in Texas for misconduct within the context of an underlying suit, citing *Trevino v. Ortega*, 969 S.W.2d 950 (Tex.1998) and *Kale v. Palmer*, 791 S.W.2d 628 (Tex.App.-Beaumont 1990, writ denied). Accordingly, they argued, Prostok had no viable causes of action because all of his claims depended on the Officers' and Directors' alleged perjury, failure to disclose material information, destruction or concealment of evidence, and negligence in the context of the underlying bankruptcy proceeding.

#### 1. Prostok's Arguments

Prostok acknowledges that, under *Trevino* and *Kale*, neither perjury nor spoliation give rise to independent causes of action in Texas, and states this is precisely why he never alleged those putative causes of action. Instead, Prostok argues he asserted claims for fraud, breach of fiduciary duty, gross negligence, and civil conspiracy—all of which are cognizable under Texas law. He contends the trial court erroneously permitted appellees to mischaracterize his claims as being solely for perjury or spoliation, and then held that the claims, thus mischaracterized, failed to state a cause of action.

Prostok argues the trial court's holding ignored key distinctions between this case and *Trevino* and *Kale*, which rejected claims of perjury and spoliation as the bases for independent causes of action. Specifically, he argues that those cases did not involve circumstances in which, as alleged here, the parties committed fraud and breaches of fiduciary duty.

Prostok's brief recognizes there are policy reasons for rejecting separate causes of action for perjury and spoliation which, by their very nature, can occur *only* in litigation. However, Prostok claims these policy reasons do not apply in a case such as this one, where the defendants allegedly breached a fiduciary duty and/or acted fraudulently. Prostok asserts that such conduct constitutes tortious behavior regardless of whether or not it occurred in the context of litigation, and the litigation context does not shield fiduciaries or defrauding parties from liability for such conduct. Lastly, he argues that if his pleadings had been unclear, the Officers and Directors should have filed special exceptions prior to moving for summary judgment so that Prostok would have an opportunity to replead.

#### 2. The Officers' and Directors' Arguments

The Officers and Directors argue that, regardless of the terms used to describe Prostok's causes of action, the substance of

his claims amounts to causes of action for perjury, spoliation, and similar misdeeds allegedly committed in the context of the bankruptcy proceedings. They assert that, per *Trevino* and *Kale*, such claims are not recognized as independent causes of action under Texas law.

The Officers and Directors argue that Prostok's attempts to distinguish this case from *Trevino* are unavailing. They first argue there is no distinction between a bankruptcy proceeding and the "ordinary" litigation involved in *Trevino*, and that appellants cite no case law to suggest that *Trevino* does not apply to actions that took place in a bankruptcy proceeding. They claim that allowing Prostok a "second trial" to "revalue" National Gypsum would render the confirmation order meaningless, and result in relitigation of the 32 month-long bankruptcy proceeding.

They also argue *Trevino* cannot be distinguished on the basis of any fiduciary duties owed by the Officers and Directors in the present case. First, they argue Prostok may not rely on any federal law that the officers and directors of a debtor-in-possession owe a fiduciary duty to the creditors in a bankruptcy proceeding. They stress that in successfully seeking to have the case remanded from federal to state court, Prostok repeatedly stated his causes of action arose under Texas state law and not federal law. Thus, the Officers and Directors assert that even if they owed a duty to National Gypsum's creditors while that entity was acting as a debtor-in-possession, Prostok has disclaimed that he is asserting any such

claims in this case. Second, they argue that, under Texas law, the officers and directors of a corporation as such owe no duty to the corporation's creditors. Thus, they owed no fiduciary duty to Prostok under Texas law. They conclude that, because *Trevino* cannot be distinguished on the bases of the nature of the litigation involved in the underlying case or the presence or absence of fiduciary duties on the part of the defendants, the summary judgment was proper.

3. Analysis

Because Prostok argues his claims are not akin to claims for spoliation or perjury, but are claims for fraud, breach of fiduciary duty, and gross negligence as alleged,[40] we first consider whether a fiduciary duty exists on the part of the Officers and Directors, the breach of which could give rise to these claims. If such a duty existed, the Officers' and Directors' arguments that Prostok's claims are nothing more than improper claims for spoliation and perjury must fail.

■ Prostok pleaded two bases for a fiduciary duty between the Officers and Directors and the Junior Bondholders. He claimed the Officers and Directors owed a fiduciary duty to creditors because they were: (1) officers and directors of an insolvent corporation; and (2) officers and directors of a debtor-in-possession in a bankruptcy case. However, on appeal, Prostok argues only that the Officers and Directors had a fiduciary duty predicated on their positions as management of a debtor-in-possession in bankruptcy. Thus,

**40.** Prostok's gross negligence claim is apparently based on the alleged breach of the duty of care owed by the Officers and Directors arising from the fiduciary duty of managers of a debtor-in-possession in bankruptcy. Prostok does not allege against the Officers and Directors a claim that they aided and abetted the breach of fiduciary duty by others. Instead, Prostok alleges they owed a direct fiduciary duty to Prostok. Although the conspiracy claim was alleged against all defendants, the claim is based on an alleged conspiracy to defraud or breach fiduciary duties. Thus, the conspiracy claim depends on the fraud and breach of fiduciary duty claims and we do not discuss it separately.

he has waived any argument that the Officers and Directors owed a fiduciary duty as officers and directors of an insolvent corporation.[41]

### a. Reliance on Federal Law

██ In determining whether a fiduciary duty exists under Prostok's second theory, we must first address the Officers' and Directors' preliminary argument that Prostok may only rely on state law for the existence of that fiduciary duty. The Officers and Directors rely on arguments Prostok made seeking a remand to state court. They cite the following statements from Prostok's motion to remand and reply brief filed in federal court: "the claims in this action are state law claims;" and "Plaintiff has filed a Complaint alleging state law causes of action that Defendants breached their obligations.... There is no federal remedy for the Defendants' violation of their obligations ..."[42] The Officers and Directors argue that Prostok "disclaimed" that his causes of action arose under federal law, and thus that he may not look to federal law as a source of any fiduciary duty owed by the Officers and Directors to Prostok. We disagree.

In essence, the Officers' and Directors' argument is a waiver argument. They argue Prostok waived his allegation that the fiduciary duty resulted from their status as managers of a debtor-in-possession by his arguments against the existence of federal question jurisdiction.

We first consider the allegations in Prostok's petition at the time of removal. Prostok's original petition contained factual allegations regarding the National Gypsum bankruptcy, the disputes over valuation, the alleged misrepresentations and non-disclosures during the confirmation proceedings, and the subsequent announcement of the cost-savings plan after the close of the bankruptcy case. Based on these factual allegations, Prostok alleged the Officers and Directors "as officers and directors of debtor-in-possession [National Gypsum] and Aancor owed fiduciary duties to the creditors of [National Gypsum] until [National Gypsum] consummated its plan of reorganization." Prostok alleged a breach of these duties and damages proximately caused by the breach.[43] At that time, Prostok's petition alleged no other basis for a fiduciary duty on behalf of the Officers and Directors.

The defendants removed this case to federal court claiming the federal court had subject matter jurisdiction because Prostok's suit was either a civil action "arising under the Constitution, laws, or

---

**41.** The source of this alleged fiduciary duty to creditors of an insolvent corporation is the equitable trust fund doctrine. We question to what extent this doctrine exists outside of the dissolution of a corporation. If the doctrine is limited to dissolution of a corporation, it would not apply in this case because National Gypsum did not dissolve; it was reorganized in bankruptcy. Further, as currently codified, the doctrine does not create a fiduciary duty between officers and directors and creditors of the corporation. *Hunter v. Fort Worth Cap. Corp.*, 620 S.W.2d 547, 551 (Tex.1981) (TEX. BUS. CORP. ACT ANN. art. 7.12 "bars resort to the trust fund theory as it exists apart from the statute."); *see also* TEX. BUS. CORP. ACT ANN. art. 7.12(B) (Vernon Supp.2003) (directors owe

the same duty to corporation after dissolution as they do before dissolution).

**42.** The Officers and Directors also cite similar statements in portions of the Asbestos Claimants' motions and briefs seeking remand of the suit they originally filed in Orange County. Because of the partial settlements, the Asbestos Claimants are no longer parties to this appeal and we do not consider these statements in addressing Prostok's appeal.

**43.** He also alleged causes of action for fraud and constructive fraud (based on non-disclosures by a fiduciary) and negligent misrepresentation.

treaties of the United States," 28 U.S.C. § 1331, or a proceeding "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Prostok's motion to remand alleged his action did not arise under the Constitution, laws, or treaties of the United States because he did not challenge any order of the bankruptcy court, and because his claims were state law claims. *See* 28 U.S.C. § 1331. He also argued there was no jurisdiction under the "related to cases under title 11" provision of 28 U.S.C. § 1334(b) because his claims could have no conceivable effect on the estate in the bankruptcy case. In the alternative, he requested the federal court to abstain or remand on equitable grounds. The record does not contain a copy of Prostok's brief in support of this motion.

The summary judgment record includes Prostok's reply brief regarding the motion to remand filed after the motion had been referred to the bankruptcy court. This brief is twenty-five pages and addressed several issues and arguments regarding federal jurisdiction under 28 U.S.C. §§ 1331, 1334. The main thrust of these arguments was that the outcome of Prostok's claims could have no conceivable effect on the debtor, National Gypsum, or the bankruptcy estate because the debtor was not a party and the estate had been administered.

In support of his motion to remand, Prostok also argued there was no "federal question" jurisdiction because federal law did not supply a federal remedy for his complaints, citing *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 813, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) ("the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction"). The thrust of this argument was that federal law must create a federal remedy in

order for the case to "arise under the laws of the United States." Prostok argued that absent a federal remedy, the mere connection with federal law or the alleged violation of a duty flowing from a federal statute did not confer federal question jurisdiction under sections 1331 or 1334(b).

The bankruptcy court concluded Prostok's petition did not assert claims against the debtors, did not try to bring claims on behalf of the debtor, and did not involve property of the bankruptcy estates or attempt to recover property for the benefit of the estates. Thus, the case was not related to a case under the bankruptcy code. *See* 28 U.S.C. § 1334(b). "While this court regrets that its limited jurisdiction requires that a state court grapple with bankruptcy-related issues, state courts nevertheless must often address bankruptcy issues." *Prostok v. Browning (In re Nat'l Gypsum Co.),* order p. 6, Nos. 390–37213–SAF–11, 390–37214–SAF–11, Adv. No. 395–3612 (Bankr.N.D.Tex. March 26, 1996). The court also concluded it lacked ancillary jurisdiction and federal question jurisdiction. *Id.* at 7; *see also* 28 U.S.C. § 1331. The district court affirmed the bankruptcy court's decision on the motion to remand. *Browning v. Prostok (In re Nat'l Gypsum Co.),* No. 3:96–CV–1206–P, Adv. No. 395–3612, mem. op. and order (N.D.Tex. Feb. 25, 1997). Significantly, it noted that some arguments in favor of federal jurisdiction (and thus against remand) had not been presented to the bankruptcy court, and thus had been waived. *Id.*

We need not address the intricacies and nuances of federal question jurisdiction, and we decline to do so. That question has been answered by the federal courts and we do not doubt their expertise in determining that Prostok's allegation— that the Officers and Directors owed him a

fiduciary duty "as officers and directors of the debtor[ ]-in-possession"—did not implicate sufficient federal interests to warrant the exercise of federal jurisdiction.[44] We need only determine whether the statements from Prostok's motion and brief seeking a remand amount to a waiver of the allegation in his original petition as to the source of an alleged fiduciary duty. We consider the entirety of Prostok's arguments, as contained in the summary judgment record, to determine if he has waived his allegation of the source of the fiduciary duty claim.

In his brief on the motion to remand, Prostok never "disclaimed" that the source of the Officers' and Directors' duties (the alleged breach of which gave rise to his causes of action) was their status as managers of a debtor-in-possession in bankruptcy. He merely argued there was no federal remedy for the breach of those obligations, and therefore no federal jurisdiction over his case. He also argued that the case must present a substantial federal issue in order for jurisdiction to exist and no such issue existed in this case. On the same page of his brief cited by the Officers and Directors, Prostok concluded, "Unless

a federal cause of action and its remedy are legislated, there is no federal jurisdiction. Here, the alleged federal issue, if any, is at most tangential and is insufficient to confer federal question jurisdiction."

Thus, Prostok never denied a federal law may have some connection with the case. The gravamen of Prostok's claims, then and now, is that the Officers and Directors owed the Junior Bondholders a fiduciary duty, they breached that duty, and the Junior Bondholders were damaged as a result. While he clearly emphasized the state law aspects of his case, he never withdrew, disclaimed, or waived his contention that the fiduciary duty arose as a result of the Officers' and Directors' status as managers of a debtor-in-possession in a federal bankruptcy proceeding. We do not see in Prostok's statements an intentional or implied waiver of federal bankruptcy law as the source of the fiduciary duties he claims were breached. Indeed, had he done so, he would have had to drop the fiduciary duty claim entirely, because that was the *only* basis for the fiduciary duty he alleged in his operative pleading at that time.[45] His arguments for remand

**44.** The district court felt Prostok's causes of action were based on the trust fund doctrine and were "independent of federal law." Thus the claims did not "arise under" the Constitution, laws, or treaties of the United States. *Browning v. Prostok (In re Nat'l Gypsum Co.),* No. 3:96–CV–1206–P, Adv. No. 395–3612, mem. op. and order p. 15 (N.D.Tex. Feb. 25, 1997). Contrary to the district court's characterization of Prostok's fiduciary duty claim, Prostok's petition at that time clearly alleged only that the claimed fiduciary duty arose from the Officers' and Directors' status as managers of the debtor-in-possession.

However, Prostok did not allege that federal law created his cause of action for breach of that fiduciary duty. Therefore, the district court's conclusion that "[f]ederal law neither creates theses [sic] causes of action nor does an essential element of these claims turn on a

construction of the federal bankruptcy laws" is correct. *See Howery v. Allstate Ins. Co.,* 243 F.3d 912, 917 (5th Cir.), *cert. denied,* 534 U.S. 993, 122 S.Ct. 459, 151 L.Ed.2d 377 (2001) (general reference to federal law did not raise federal question jurisdiction; federal question jurisdiction will exist based on state law cause of action only if (1) a federal right is an essential element of a state claim, (2) interpretation of a federal right is necessary to resolve the case, and (3) the question of federal law is substantial).

**45.** Prostok later amended his petition to add the allegation of a fiduciary duty to creditors owed by the officers and directors of an insolvent corporation. This allegation may have resulted from Judge Solis's discussion of the trust fund doctrine in his opinion affirming the bankruptcy court's remand order. For purposes of this appeal, Prostok has aban-

are not inconsistent with his allegation that a fiduciary duty exists between the officers and directors of a corporate debtor-in-possession and creditors of the debtor during the bankruptcy proceeding. Therefore, we reject the Officers' and Directors' argument that Prostok has disclaimed federal law as the source for the duties he alleges were breached in this case.

Implicit in the Officers' and Directors' argument is the assumption that in order for the federal court to remand the case, Prostok necessarily had to "disclaim" any and all connection between the allegations in his petition and federal law, no matter how remote. This is false. The federal courts could remand this case without such a disclaimer. Indeed, the bankruptcy court recognized that on remand the state court would have to "grapple with bankruptcy-related issues." Nevertheless, it determined that the case fell outside its limited jurisdiction under section 1334(b), and did not implicate sufficient federal interests to warrant the exercise of federal jurisdiction under section 1331. The federal district court affirmed that decision, while noting that some arguments in favor of federal jurisdiction had been waived. *Browning v. Prostok (In re Nat'l Gypsum Co.)*, No. 3:96–CV–1206–P, Adv. No. 395–

3612, mem. op. and order (N.D.Tex. Feb. 25, 1997).[46]

▮ In the first point of their motion for rehearing, the Officers and Directors argue that "prior remand proceedings in federal court preclude Prostok from prosecuting a fiduciary duty claim premised on a federal law duty." The Officers' and Directors' arguments center on the federal district court's February 25, 1997 memorandum opinion and order (which affirmed the bankruptcy court's March 26, 1996 order remanding this case to state court), which they state "specifically identified the nature of the claim being remanded" as a claim based on a state law theory known as the "trust fund doctrine"—a theory that all parties acknowledge is inapplicable to the case. The Officers and Directors assert that we are failing to "respect the federal court's decision regarding the nature of Prostok's claim," and give three reasons why this asserted failure constitutes error.

First, the Officers and Directors argue "the federal court's resolution of issues pertinent to its subject matter jurisdiction is entitled to preclusive effect." [47] Second, they argue that "because the federal district court was sitting as an appellate court of last resort for the question of federal

---

doned this basis for the existence of a fiduciary duty. Further, we question whether Texas law recognizes a fiduciary duty to creditors under the trust fund doctrine. *See supra* p. 908, fn. 41.

**46.** Further, federal courts must determine jurisdiction "by reference to the 'well-pleaded complaint.'" *Merrell Dow*, 478 U.S. at 808, 106 S.Ct. 3229. A corollary to the well-pleaded complaint rule, the "artful-pleading doctrine," prevents a plaintiff "from avoiding removal by framing in terms of state law a complaint the real nature of [which] is federal, regardless of plaintiff's characterization, or by omitting to plead necessary federal questions in a complaint." *Marcus v. AT&T Corp.*, 138 F.3d 46, 55 (2d Cir.1998). Thus Prostok,

by artful pleading, could not have avoided a federal question if one existed. The substance of Prostok's petition alleged a duty owed to creditors by the Officers and Directors "as officers and directors of a debtor-in-possession." The federal courts determined that the substance of Prostok's petition did not raise a federal question, despite the fact that the issue obviously involved federal bankruptcy law.

**47.** In support, the Officers and Directors cite to *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585–586, 119 S.Ct. 1563, 1571, 143 L.Ed.2d 760 (1999), as holding that a federal court's claim construction in its order remanding the case to state court will "'travel back with the case' and bind the parties in state court."

jurisdiction, its decision on this issue should be law of the case." Third, they argue that, "having obtained affirmative relief in federal court by asserting that the fiduciary duty claim was premised on a state law duty, Prostok is judicially estopped from inconsistently asserting that the claim is premised on a federal law duty when it later becomes advantageous to do so."

However, the Officers and Directors did not move for summary judgment on the grounds that the federal district court's February 25, 1997 memorandum opinion and order precluded Prostok from "prosecuting a fiduciary duty claim premised on a federal law duty." Nor did they assert any other grounds for summary judgment based on that order.[48] Thus, the Officers' and Directors' arguments of claim preclusion, law of the case, and judicial estoppel—all based on the February 25, 1997 memorandum opinion and order—cannot support the trial court's entry of summary judgment in their favor. *See Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993) ("[W]e hold that a summary judgment cannot be affirmed on grounds not expressly set out in the motion or response."); *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 339–42 (Tex.1993) ("A motion must stand or fall on the grounds expressly presented in the motion.").

### b. Existence of Fiduciary Duty

We now consider whether the Officers and Directors, as managers of a corporate debtor-in-possession under the Bankruptcy Code, owed a fiduciary duty to the corporation's creditors. The Officers and Directors dispute the existence of any duty between officers and directors of an insolvent corporation and its creditors, the so-called trust fund doctrine. However, the Officers and Directors do not dispute that a debtor-in-possession and its management owe a fiduciary duty to the estate and creditors in a bankruptcy case.

A trustee in bankruptcy owes a fiduciary duty to the parties, including creditors of the debtor. *Bezanson v. Bayside Enter., Inc. (In re Medomak Canning),* 922 F.2d 895, 901 (1st Cir.1990); *Ford Motor Credit Co. v. Weaver,* 680 F.2d 451, 462 n. 8 (6th Cir.1982) ("A trustee in bankruptcy or a debtor-in-possession, as a fiduciary, represents both the secured and unsecured creditors of the debtor."). As with other fiduciaries, a bankruptcy trustee's breach of fiduciary duties gives rise to liability for resulting damages. For example, a trustee in bankruptcy is personally liable for a breach of its fiduciary duties. *See Mosser v. Darrow,* 341 U.S. 267, 274, 71 S.Ct. 680, 95 L.Ed. 927 (1951); *see also Dodson v. Huff (In re Smyth),* 207 F.3d 758, 761 (5th Cir.2000) (adopting a gross negligence standard of care for the personal liability of a bankruptcy trustee). Federal courts have "uniformly held that bankruptcy trustees are subject to personal liability for the willful and deliberate violation of their fiduciary duties." *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.,* 838 F.2d 612, 621 (1st Cir.1988); *see also Lopez–Stubbe v. Rodriguez–Estrada (In re San Juan Hotel Corp.),* 847 F.2d 931, 937 (1st Cir.1988). This liability may be enforced directly against the trustee by creditors who have been injured by the

---

**48.** In addition to the spoliation and perjury ground mentioned above, the Officers and Directors moved for summary judgment on the grounds that: (1) Prostok's claims constituted a collateral attack on the bankruptcy court's confirmation order and were barred by Section 1144 of the Bankruptcy Code; (2) Prostok's claims relied on a "fraud on the market" theory that was inapplicable to the case; and (3) any conspiracy claims failed because there was no underlying tort.

breach. *See Lopez–Stubbe,* 847 F.2d at 937; *Connecticut Gen.,* 838 F.2d at 621–22 (creditor has cause of action against trustee personally for harms caused to creditor by trustee's intentional violation of fiduciary duty); *In re Cochise College Park, Inc.,* 703 F.2d 1339, 1357–58 (9th Cir.1983) (trustee may be personally liable to creditor for negligent violations of duties imposed by law).

 Unless the court appoints a trustee, the debtor in a chapter 11 bankruptcy remains in possession of its property and manages its ongoing business as a "debtor-in-possession." 11 U.S.C. § 1104. The debtor-in-possession assumes most of the powers and duties of the trustee. 11 U.S.C. § 1107(a). The debtor-in-possession is no longer a private party working for its own self-interest: "[T]he debtor, though left in possession by the judge, does not operate [the business] as it did before the filing of the petition, unfettered and without restraint." *In re Hughes,* 704 F.2d 820, 822 (5th Cir.1983) (quoting, *In re E. Paul Kovacs and Co., Inc.,* 16 B.R. 203, 205 (Bankr.D.Conn.1981)).

The United States Supreme Court described the duties owed by a debtor-in-possession and its management to the debtor's creditors as fiduciary in nature:

> [S]o long as the Debtor remains in possession, it is clear that the corporation bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession.... It is equally apparent that in practice these fiduciary responsibilities fall not upon the inanimate corporation, but upon the officers and managing employees who must conduct the Debtor's affairs under the surveillance of the court.... If, therefore—as seems beyond dispute from the very terms of the statute—the trustee is himself a fiduciary ... logic and consistency would cer-

tainly suggest that those who perform similar tasks and incur like obligations to the creditors and shareholders should not be treated differently under the statute for this purpose.

*Wolf v. Weinstein,* 372 U.S. 633, 649–50, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) (president and general manager of debtor were fiduciaries whose compensation could be denied for trading in debtor's stock without court approval). The Supreme Court reaffirmed this principle under the bankruptcy code in *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). There the Court rejected an argument that, because a bankruptcy trustee owes its fiduciary duty to creditors as well as shareholders, the directors of a corporation in bankruptcy should have control of the attorney-client privilege rather than the bankruptcy trustee. *Id.* 471 U.S. at 355, 105 S.Ct. 1986. However, in doing so, the Court recognized, albeit in dicta, that "if a debtor remains in possession—that is, if a trustee is not appointed—*the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders* as would the trustee for a debtor out of possession." *Id.* (emphasis added). The Court continued, "Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'" *Id.* (quoting *Wolf,* 372 U.S. at 651, 83 S.Ct. 969).

 Thus, the debtor-in-possession and its management stand in the shoes of the trustee. *See In re Hughes,* 704 F.2d at 822. It follows that if management of a debtor-in-possession breaches the fiduciary duties owed to creditors, those creditors can sue management for the damages caused by the breach. *See Weaver,* 680 F.2d at 462 (claim by creditor against

debtor-in-possession for failure to safe-guard assets of estate remanded to determine whether debtor-in-possession "was negligent or acted willfully and deliberately in violation of his fiduciary duties to the creditors of the Weaver Farms estate."); *see also Lopez–Stubbe,* 847 F.2d at 937; *Connecticut Gen.,* 838 F.2d at 621–22.

■ When National Gypsum filed for protection under the bankruptcy laws and became a debtor-in-possession, and indeed actively fought to maintain that status, it along with its management assumed the duties and responsibilities of a trustee in bankruptcy. The Officers and Directors had "essentially the same fiduciary responsibilities to creditors as does a trustee for a debtor that is out of possession." *Bernstein v. Donaldson (In re Insulfoams, Inc.),* 184 B.R. 694, 703 (Bankr.W.D.Pa. 1995), *aff'd,* 104 F.3d 547 (3d Cir.1997).

■ Although in a slightly different context, the Fifth Circuit's statements in *Louisiana World Exposition v. Federal Insurance Co.* are equally applicable to the Officers and Directors:

> The appellees' argument seems premised on the bizarre notion that a debtor-in-possession is under no obligation to act in the best interests of the creditors. The appellees' position "ignores the fact that bankruptcy causes fundamental changes in the nature of corporate relationships." *See Weintraub,* 471 U.S. at 355, 105 S.Ct. at 1994.

858 F.2d 233, 249–50 (5th Cir.1988). Thus, we conclude Prostok is asserting claims against the Officers and Directors arising out of alleged breaches of the duties owed to creditors of National Gypsum, such as the Junior Bondholders, as a result of the Officers' and Directors' alleged status as managers of a corporation acting as a debtor-in-possession in a pending bankruptcy case. Because of the nature of the summary judgment grounds raised in the Officers' and Directors' motion for summary judgment, we need not characterize the duties and the cause of action as either federal or state in nature. We only decide that Prostok is asserting a claim for breach of the duties of a debtor-in-possession in a bankruptcy case and is not asserting a cause of action for spoliation or perjury.

In their motion for rehearing, the Officers and Directors argue that we are "creating" a hybrid cause of action. We disagree with that assertion. Rather than "creating" any new causes of action, hybrid or otherwise, we review the trial court's summary judgment based on the grounds raised in the Officers' and Directors' motion for summary judgment, and conclude that Prostok is asserting a cause of action for breach of the duties owed by a debtor-in-possession to creditors in a bankruptcy proceeding, and that Prostok did not disclaim reliance on federal law in pleading this cause of action. Characterizing Prostok's claims as state, federal, or otherwise is irrelevant to the issues before the court.

The Officers and Directors also argue in their motion for rehearing that we are misconstruing the nature of a debtor-in-possession's duties under federal law. They argue the duties of a debtor-in-possession to creditors are only owed to creditors collectively, not to individual creditors such as Prostok. The Officers and Directors argue that Prostok's claims allege a harm to the estate as a whole, asserting that "[i]f the estate's valuation had been higher, multiple classes of creditors—trade creditors, environmental creditors, and others—would have benefitted." Therefore, the Officers and Directors argue, "the claim Prostok asserts could only be brought under federal law on behalf of the estate as a whole, not by him or his class of creditors particularly."

We question the Officers's and Directors' assertion that Prostok's claims allege that their actions harmed to the estate as a whole. This is not a case in which a creditor alleges that the debtor's management concealed or converted the estate's *assets*, thus making them unavailable for distribution to any of the creditors. Rather, Prostok alleges that the Officers and Directors, in cooperation with a competing creditor group, withheld *information* about the true value of the estate's assets in order to benefit one class of creditors (the Senior Bondholders) over the others classes, including the Junior Bondholders. However, the ultimate answer to this question is not relevant to our resolution of the current appeal. The Officers and Directors did not raise this argument in their motion for summary judgment. Therefore, this argument will not sustain the trial court's summary judgment against Prostok's claims. *See* Tex.R. Civ. P. 166a(c).

### c. Spoliation and Perjury

Having concluded that Prostok is alleging a cause of action for breach of duties owed to the Junior Bondholders by the Officers and Directors while National Gypsum was a debtor-in-possession in the bankruptcy, and that Prostok did not disclaim federal law as the source for the duties he alleges were breached, we now turn to whether Prostok's claims amount to independent causes of action for spoliation and perjury, not cognizable under Texas law pursuant to *Trevino* and *Kale*.

The Officers and Directors assert it is the substance of Prostok's allegations, not the form, that determines the true nature of his pleadings, and that those pleadings assert claims akin to spoliation and perjury. We agree that the true nature of a lawsuit is based on the facts alleged in the petition, the rights asserted, and the relief sought. *Renwar Oil Corp. v. Lancaster*, 154 Tex. 311, 313, 276 S.W.2d 774, 775 (1955); *Kale*, 791 S.W.2d at 631 (citing *Renwar Oil Corp.*); *Finder v. O'Connor*, 615 S.W.2d 283, 284 (Tex.Civ. App.-Dallas 1981, writ dism'd). We also conclude that to determine the true nature of a lawsuit, facts alleged in a response to a motion for summary judgment, even if not pleaded, may be considered as well. *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 699 (Tex. 2000) (issue raised in response to summary judgment motion was sufficient to preserve error even if issue not pleaded). However, because a debtor-in-possession and its management owe duties to the bankruptcy estate and/or its various creditors, and Prostok has not disclaimed federal law as the source of those duties, his claims are not, in form or substance, independent causes of action for spoliation and perjury. Thus, we reject the argument that Prostok's pleadings assert claims akin to spoliation and perjury.

The second and fourth points of the Officers' and Directors' motion for rehearing also relate to their summary judgment argument that Prostok's claims were in substance claims for spoliation and perjury, barred by *Trevino* and *Kale*. In their second point, the Officers and Directors assert that we are improperly "fashioning a state law action dependent on duties owed by a debtor-in-possession under federal bankruptcy law." They characterize this purported new cause of action as a "hybrid" never before recognized under Texas law. Similarly, in their fourth point they argue that our interpretation of the duties of a debtor-in-possession under federal bankruptcy law "infects" our consideration of *Trevino* and *Kale*.

We disagree with the assertion that we are fashioning a new cause of action. Prostok, on behalf of the Junior Bondhold-

ers, pleaded *inter alia* that: (1) the Officers and Directors, as officers and directors of National Gypsum, a debtor-in-possession, owed fiduciary duties to National Gypsum's creditors until the plan of reorganization was consummated; (2) the Officers and Directors breached that duty in various ways; and (3) the Junior Bondholders were injured as a result of those breaches. In response, the Officers and Directors moved for summary judgment on the basis, *inter alia*, that no duty existed between the Junior Bondholders and the Officers and Directors, and thus no duty that could have been breached to give rise to a cause of action. In making this last argument, the Officers and Directors argued there was no duty under applicable state law, and that any applicable duty under federal law had been disclaimed by the Junior Bondholders. In rejecting the Officers' and Directors' position, we create no new cause of action under state or federal law. We merely recognize that under federal law, the Officers and Directors, as officers and directors of a debtor-in-possession, owe a fiduciary duty to the debtor's creditors such as the Junior Bondholders, and that the Junior Bondholders have not disclaimed federal law as the source for that fiduciary obligation. These conclusions do not amount to the creation of a new cause of action, hybrid or otherwise, despite protestations to the contrary.

Also, although we disagree with the characterization of the Junior Bondholders' claims as being of a "hybrid" state-federal nature, we are not convinced any such characterization is relevant to the issues before this court. The fact that the Junior Bondholders rely on duties resulting from the Officers' and Directors' status as managers of a debtor-in-possession under the Bankruptcy Code does not control whether causes of action for breach of those duties exist, or whether those causes of action may be pursued in Texas state court. That fact is relevant only to the issue of whether Prostok, on his own behalf and as representative of the Junior Bondholders, disclaimed reliance on that status as the basis for his claims against the Officers and Directors. Having concluded that he did not, whether the claims are characterized as state, federal, or of a "hybrid" nature is irrelevant to the resolution of this appeal.[49] It is sufficient that federal bankruptcy law establishes a duty on the part of the managers of a debtor-in-possession to the bankruptcy estate and/or its classes of creditors, that the Junior Bondholders allege a breach of that duty, and that they allege the breach caused them damages. However, in light of the motions for rehearing, we have withdrawn our prior opinion and substitute this opinion in part to make clear that we are not creating a new cause of action or characterizing the Junior Bondholders' claims as either state or federal in nature.

We conclude the substance of the Junior Bondholders' pleadings do not allege causes of action for spoliation and perjury and the Junior Bondholders are not barred by the holdings in *Trevino* and *Kale* from bringing this action. The Officers' and Directors' spoliation and perjury arguments do not support the summary judgment.

---

**49.** To the extent such a characterization is relevant, Prostok's pleadings did not characterize the claims as either federal or state. The Officers and Directors never challenged Prostok's pleadings on this ground by special exception. Any defect in Prostok's pleadings should have been raised by special exception, not a motion for summary judgment. *In re B.I.V.*, 870 S.W.2d 12, 13 (Tex.1994) (summary judgment should not be based on pleading deficiency that could be cured by amendment).

## C. Fraud on the Market

One of the grounds for summary judgment asserted by the Officers and Directors related to the "reliance" element of one or more of Prostok's causes of action. The Officers and Directors asserted that it was undisputed that *Prostok* did not rely on anything said or done by them in the bankruptcy proceeding. Rather, they asserted Prostok's fraud claim was based on the *bankruptcy court's* reliance on statements made by or on behalf of the Officers and Directors. Their motion thus asserted that "Plaintiff's claim is facially similar to an individual reliance-free 'fraud on the market' claim." [50] Because such a "fraud on the market" theory was inapplicable, and thus not available to fulfill the "reliance" element of Prostok's fraud claim, the Officers and Directors asserted they were entitled to summary judgment as a matter of law on that claim.

Prostok's response to the motion for summary judgment disclaimed any dependency on a "fraud on the market" theory as to any claim. He asserted that such a theory only applied to securities fraud claims, and that he was not alleging securities fraud. He further asserted that reliance was not an element of any of his claims against the Officers and Directors, except for his fraud claim. As to that fraud claim, he asserted that he "expects to prove class wide (sic) reliance as described in the Petition. Throughout the bankruptcy, the Bondholder Class was represented by the BT Committee and its

counsel. These agents were defrauded by the Defendants' concealment and misrepresentations."

### 1. Prostok's Arguments

Prostok attacks the summary judgment to the extent it was based upon the contention that the claims were somehow dependent on a "fraud on the market" theory. Prostok asserts that the "fraud on the market" contention is a red herring, and is not at all pertinent to this case. More specifically, Prostok argues that his pleadings do not mention fraud on the market and no special exceptions were filed regarding such a theory. Prostok further argues that the fraud on the market theory applies to prove reliance in securities fraud cases, and this is not a securities fraud case. Additionally, Prostok points out that reliance is not a necessary element of his claims other than common-law fraud; thus, even if a fraud on the market defense were applicable, it is not an appropriate basis for summary judgment on his non-fraud claims.

Regarding the fraud claim, Prostok argues that the theory is based, among other things, on the allegation that the Officers and Directors defrauded the BT Committee and its counsel, which acted as Prostok's agents. Accordingly, any indirect reliance would be through Prostok's own agents, and not arising from a general fraud on the market theory.

### 2. The Officers' and Directors' Arguments

> When one fails to disclose or represents material information about a security, the market's efficient pricing mechanism is skewed and the price of the security is distorted. A purchaser or seller who relies on the market to accurately value the security suffers damages if the market does not have all the information.
> *Finkel v. Docutel/Olivetti,* 817 F.2d 356, 360 (5th Cir.1987).

---

**50.** The Officers' and Directors' motion, quoting *Finkel v. Docutel/Olivetti,* described the "fraud on the market theory" as follows:

> The fraud on the market theory is premised on the hypothesis that the market price of a security, in an open market environment as opposed to a private transaction between seller and buyer, accurately reflects the value of that security if all relevant information has been disclosed in the marketplace.

In response, the Officers and Directors essentially reiterate the arguments made in support of their motion for summary judgment based upon fraud on the market mentioned above.

### 3. Analysis

▇▇▇▇▇ This asserted ground for summary judgment goes to the reliance element of Prostok's fraud claims. Fraud requires that the material misrepresentation induce some reliance on the part of the defrauded party. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex.1997). Reliance is an essential element of fraud even in failure to disclose cases. *Id.* Prostok asserted reliance through his agents and representatives in the bankruptcy proceedings. Such reliance is permissible and will support a fraud claim. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573 (Tex.2001) (misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct).

The Officers and Directors suggest that neither Prostok nor his agents or representatives relied on anything from the Officers and Directors in the bankruptcy court. However, the summary judgment evidence offered to support this argument is merely the affidavit of one of appellees' attorneys to the effect that the bankruptcy case was hotly contested, the parties, including Prostok and his predecessors, were represented by independent counsel and experts, and extensive discovery and evidence on the question of value was presented in the bankruptcy case.

▇▇▇▇ Evidence that a party was represented by independent counsel does not negate the element of reliance in a fraud claim. The supreme court expressly rejected this argument in *Schlumberger*: "Schlumberger asks us to adopt a per se rule that the presence of independent legal counsel always precludes a claim that a party fraudulently induced a release. Texas law does not support such a rule." *Schlumberger*, 959 S.W.2d at 178. Further, this evidence does not prove as a matter of law that Prostok did not rely on the prior statements of management (in the disclosure statement) to the effect that expenses could not drop and would increase at about three percent per year. Nor does the record establish as a matter of law that Prostok did not rely on the non-disclosure of the cost-savings plan in proposing a competing plan or in choosing to support management's plan. At best, the argument raises a fact question on the issue of actual reliance.

Prostok argues that by making the "fraud on the market" argument, the Officers and Directors ignored the actual reliance by Prostok and his agents and thus failed to carry their summary judgment burden. Again, Prostok bases his fraud claim on the alleged reliance of the BT Committee and its lawyers, acting as his agents, on the alleged misrepresentations and failures to disclose by the Officers and Directors. Given the contentious history of the bankruptcy case, it is difficult to see how Prostok will be able to prove, in support of his fraud claim, that these agents actually relied on anything the Officers and Directors said or did. However, in a traditional motion for summary judgment, the Officers and Directors had the burden to conclusively negate the essential element of reliance as a matter of law.[51] The Officers and Directors have not shown that the only possible basis for the reliance

---

51. The Officers and Directors did not file a no-evidence motion for summary judgment under Tex.R. Civ. P. 166a(i).

element of fraud is an inapplicable "fraud on the market" theory. Accordingly, the Officers' and Directors' argument that Prostok is relying on a non-applicable "fraud on the market" theory will not support the summary judgment.

### D. Conspiracy Claims

The Officers and Directors asserted in their motion for summary judgment that where a party fails to establish any other substantive tort, there is no liability for conspiracy.

#### 1. Prostok's Claims

Prostok recognizes that his conspiracy claim is dependent on his other theories of recovery. He argues that those theories are valid and therefore the conspiracy claim is not subject to summary judgment on this ground.[52]

#### 2. The Officers' and Directors' Claims

The Officers and Directors assert based on the other grounds for summary judgment that Prostok has no tort cause of action and therefore the conspiracy claim is also barred. Additionally, they argue that, because Prostok did not argue there was error as to this ground for summary judgment, he waived the argument as a basis for this appeal.

#### 3. Analysis

▮▮▮ Prostok alleged a conspiracy between the Officers and Directors, DLJ, and the TCW Parties to commit fraud and breach the fiduciary duty owed by the Officers and Directors to Prostok. Conspiracy is a derivative theory by which other parties can be held liable for the commission of an underlying tort. *See Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex.1996). However, the other parties

have settled and are no longer in this dispute; only Prostok and the Officers and Directors remain. We doubt that a basis remains for the conspiracy claim against the Officers and Directors because the torts underlying the alleged conspiracy were allegedly committed directly by the Officers and Directors themselves. However, the only ground for summary judgment on this claim raised below was the absence of *any* underlying tort. The Officers and Directors moved for summary judgment on the ground that the underlying torts did not exist and therefore, they could not conspire with others to commit such torts. To sustain the summary judgment on this ground, we must find that all of the tort claims were barred as a matter of law. Because we have found that some of Prostok's tort claims survive, the summary judgment on the conspiracy claim cannot stand on the ground that no tort claims exist. *See id.* Therefore, the Officers' and Directors' failed to meet their summary judgment burden to show that they were entitled to judgment as a matter of law on the conspiracy claims.

### E. Grounds Not Raised by the Officers and Directors

▮▮ The Senior Bondholders and Houlihan Lokey raised claim preclusion and issue preclusion (res judicata and collateral estoppel) in their Supplemental Motion for Summary Judgment asserted against the Asbestos Claimants. DLJ also asserted res judicata and collateral estoppel against Prostok and the Asbestos Claimants in its Motion for Summary Judgment on Preclusion Grounds. These appellees have settled and been severed from this appeal. The TCW Parties also raised res judicata and collateral estoppel

---

**52.** This point was preserved by Prostok's *Malooly* point. By arguing for the existence of the underlying tort claims, Prostok sufficiently argued this issue on appeal. TEX.R.APP. P. 38.1(h).

against Prostok in their Supplemental Motion for Summary Judgment. However, we are rendering judgment in favor of the TCW Parties against Prostok on limitations grounds and do not discuss the other grounds they raised for summary judgment.

The *only* motions for summary judgment asserted by the Officers and Directors were the motion challenging the standing of the Asbestos Claimants and the Joint Motion for Summary Judgment on All Claims. As we have discussed, the Joint Motion raised bankruptcy code section 1144 and collateral attack as grounds for summary judgment. However, neither motion sought summary judgment on the grounds of res judicata or collateral estoppel.

On appeal, the Officers and Directors mention res judicata and collateral estoppel in passing, but their entire argument consists of two sentences:

> Plaintiffs seek to undo the bankruptcy court's determination of enterprise value, impose a "constructive trust" on assets allocated to creditors by the bankruptcy court and redistribute them to other creditors who participated in the bankruptcy. Such a rehashing of claims is barred by res judicata, collateral estoppel, and the federal bankruptcy law. *See Miller v. Meinhard–Commercial Corp.*, 462 F.2d 358 (5th Cir.1972); *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 869 (5th Cir.1984); 11 U.S.C. § 1144.

We conclude the Officers and Directors may not rely on res judicata and collateral estoppel as grounds for affirming the sum-

mary judgment because they did not raise those grounds in their summary judgment motion. *See* Tex.R. Civ. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor."); *Stiles*, 867 S.W.2d at 26; *McConnell*, 858 S.W.2d at 341.

## V. NEW NGC CROSS-APPEAL

New NGC brings six issues[53] in its cross-appeal; these issues resolve themselves into three subjects: dismissal of the intervention; standing and ownership of Prostok's claims; and the fee-shifting provision.

■ First, New NGC complains that the trial court erred in dismissing its intervention as moot. New NGC intervened claiming it owned the claims asserted in this suit, not Prostok. New NGC also filed a cross-claim against Prostok under the fee-shifting provision of the bankruptcy plan. A trial court has discretion regarding a plea in intervention, but may not strike an intervention on its own motion. *Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990); *Flores v. Melo–Palacios*, 921 S.W.2d 399, 404 (Tex.App.-Corpus Christi 1996, writ denied). Therefore, the trial court abused its discretion in striking New NGC's intervention on its own motion. Further, because of our reversal of the summary judgment in favor of the Officers and Directors, we find that any claims of ownership as to the surviving causes of action are not moot. We reverse the trial court's dismissal of New NGC's intervention and remand this issue to the trial court.

---

**53.** New NGC's fifth issue claims the Asbestos Claimants do not have standing to bring claims on behalf of asbestos claimants who were unknown during the National Gypsum bankruptcy. The trial court apparently granted summary judgment *in favor* of New NGC

on this issue. Thus, the issue presents nothing for review. In any event, the issues relating to the Asbestos Claimants are moot in light of the settlement reached between the Asbestos Claimants and New NGC. *See supra* p. 893–94.

Next, New NGC argues that it, and not Prostok, owns the claims asserted in this suit, and therefore Prostok lacks standing. Because the trial court dismissed New NGC's intervention, it did not rule on the ownership issue.[54] Thus, New NGC does not present a ruling of the trial court for us to review. *See* Tex.R.App. P. 33.1(a)(2). We will not consider the arguments as to ownership of the claims for the first time on appeal.

 New NGC argues that lack of standing is a subject matter jurisdiction issue and we should dismiss the case for lack of jurisdiction. New NGC also attacks standing on the basis that Prostok has no personal, distinct or separate claim from other creditors and that defendants did not owe a duty directly to Prostok. However, although characterized as standing, New NGC's real challenge is to capacity to sue.

 Standing is to be contrasted with capacity to sue. Standing, as a component of subject matter jurisdiction, can never be waived. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex.1993). Capacity to sue on the other hand can be waived. The supreme court noted this distinction stating: "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex.1996) (emphasis in original). Capacity must be challenged by a verified pleading or it is waived. *See id.* at 662; Tex.R. Civ. P. 93(1). A challenge to who owns a claim raises the issue of capacity, not standing, and requires compliance with rule 93. *See Pledger v. Schoellkopf*, 762 S.W.2d 145, 145–46 (Tex.1988) (per curiam) (contention that corporation rather than plaintiff shareholder owned fraud and tortious interference claims challenged capacity to sue and was waived); *Southwest Indus. Inv. Co. v. Berkeley House Investors*, 695 S.W.2d 615, 617 (Tex.App.-Dallas 1985, writ ref'd n.r.e.) (appellant waived issue of whether plaintiff owned the asserted contract claim by failing to comply with rule 93). Because the ownership argument goes to capacity, not standing, it does not raise a question of subject matter jurisdiction and we decline to address the issue until the trial court has ruled on it.

However, on appeal, New NGC also argues, based on its "standing" argument, that we lack subject matter jurisdiction, and thus should dismiss the case. Because this argument involves our subject matter jurisdiction, we will address it even though the trial court did not rule on the issue.

 Standing deals with whether a litigant is the proper party to bring a lawsuit, not whether the party can ultimately prevail on its claims. *Dresser Indus., Inc. v. Snell*, 847 S.W.2d 367, 375–76 (Tex.App.-El Paso 1993, no writ). The "constitutional demands of standing are that there is (a) a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Wilson v. Andrews*, 10 S.W.3d 663, 669 (Tex.1999) (citing *Tex. Ass'n Bus.*, 852 S.W.2d at 446). A person has standing to sue if:

(1) he has sustained, or is immediately in danger of sustaining, some direct injury as a result of the wrongful act of which he complains; (2) he has a direct

54. The parties have briefed and ask us to decide the question of ownership of the claims asserted. However, in light of the remand of this case, we leave to the trial court the consideration of the ownership issue.

relationship between the alleged injury and claim sought to be adjudicated; (3) he has a personal stake in the controversy; (4) the challenged action has caused the plaintiff some injury in fact, either economic, recreational, environmental, or otherwise; or (5) he is an appropriate party to assert the public's interest in the matter, as well as his own.

*Precision Sheet Metal Mfg., Co. v. Yates,* 794 S.W.2d 545, 551–52 (Tex.App.-Dallas 1990, writ denied).

▆▆▆ To the extent New NGC raises a true standing argument, we find that Prostok has sufficient standing to bring claims based on duties owed directly to creditors by the Officers and Directors as managers of a debtor-in-possession.[55] We also note that federal courts have held that the duties of a trustee or debtor-in-possession can run to individual creditors. *See Lopez–Stubbe,* 847 F.2d at 937. Thus, individual creditors would have standing to resolve the question of whether the duties ran to them. Prostok alleges the injury to him and the Junior Bondholders differs from that of other creditors, such as the Senior Bondholders who, Prostok alleges, were not injured at all but received a windfall. Prostok, on behalf of the Junior Bondholders, alleges an injury that is peculiar to him personally and not as a member of the general public. He alleges the Officers and Directors owed a fiduciary duty as managers of a debtor-in-possession in bankruptcy to all creditors of the debtor and that some but not all of those creditors were injured by a breach of that duty. He alleges he was one of the injured creditors and has a direct personal stake in the controversy.

Thus there is a real controversy in this case between Prostok and the Officers and Directors and New NGC, and the relief Prostok seeks will resolve that controversy. Prostok has a direct stake in the controversy with the Officers and Directors and the judgment in this case will resolve that controversy. *See Nootsie,* 925 S.W.2d at 662. Therefore, Prostok has standing and we have subject matter jurisdiction.

In its motion for rehearing, New NGC continues to argue that ownership of the claims in this suit goes to Prostok's standing to sue. New NGC also argues that the duties of a debtor-in-possession run to creditors collectively, not individually. New NGC argues that because the duties of the debtor-in-possession are owed to the creditor body as a whole, the debtor or the bankruptcy estate owns any claims for breach of those duties.

These arguments again go to ownership of the claims and capacity to sue, not standing. In *Pledger,* the Texas Supreme Court held that whether a corporation or an individual shareholder owns an asserted cause of action is an issue of capacity to sue, not subject matter jurisdiction, and the issue is waived by failing to file a verified denial of the capacity to sue. *Pledger,* 762 S.W.2d at 145–46. The question of ownership of a particular cause of action determines whether a party "has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie,* 925 S.W.2d at 661. Whether Prostok and the Junior Bondholders own the claims they assert in this case or whether they will ultimately prove either liability or damages was not addressed below, and is not before us. Because the ownership question does not implicate subject matter jurisdiction, it may not be raised for the first time on appeal, and New NGC must obtain a ruling from the trial court before we may review the question. *See* Tex.R.App. P. 33.1(a)(2).

---

55. *See* the discussion of duty *supra* p. 914.

We resolve New NGC's second, third, and fourth issues against it to the extent those issues raise standing. The ownership or capacity to sue questions raised in these issues are remanded to the trial court.

Finally, New NGC complains the trial court erred in granting summary judgment against its claim for attorneys' fees under the fee-shifting provision. The Officers and Directors also attack this ruling by cross-point. We question whether New NGC can trigger the fee-shifting provision by intervening in an existing lawsuit to which it was not a party. To the extent that New NGC's claims for attorneys' fees are based on its contribution and indemnity agreements with the Officers and Directors, it was unnecessary for it to intervene and thereby multiply the attorneys' fees incurred because the Officers and Directors also invoked the provisions of the fee-shifting provision of the plan.[56]

■ The Officers and Directors moved to amend their brief to add a request that we render judgment that they are unconditionally entitled to recover attorneys' fees and remand solely for a determination of the amount of attorneys' fees. The fee-shifting provision requires the losing party to pay the fees of the prevailing party. Because we have reversed the summary judgment in favor of the Officers and Directors against Prostok, the Officers and Directors are not prevailing parties. Therefore, we could not render judgment that the Officers and Directors are entitled to recover their attorneys' fees. We deny the motion.[57]

■ Turning to the merits of the summary judgment on the fee-shifting provision, the only grounds for summary judgment raised in Prostok's motion were res judicata and collateral estoppel by reason of the bankruptcy court ruling in the January 21, 1998 Order, as confirmed in the May 8, 1998 judgment, that the fee-shifting provision did not apply to Prostok's claims in this lawsuit. At the time of the summary judgment hearing, the bankruptcy court ruling was on appeal to the federal district court. Texas now follows the general rule that "a judgment is final for the purposes of issue and claim preclusion 'despite the taking of an appeal unless

---

56. We also note that there is nothing in the record showing that New NGC or the Officers and Directors tendered or provided proof of their ability to pay Prostok's attorneys' fees and costs. *See* Confirmation Order ¶ 50 (*"all parties thereto* shall be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail.") (emphasis added).

57. We also note that the Officers and Directors did not file a motion for summary judgment on the fee-shifting provision. Thus, the prayer for relief they describe as the basis for their amended brief was not supported by a motion requesting that relief from the trial court. Absent a motion for summary judgment requesting such relief and an appellate point complaining of the denial of that relief, we could not render judgment for such relief. *See Herald–Post Pub. Co. v. Hill,* 891 S.W.2d

638, 639–40 (Tex.1994); *CRA, Inc. v. Bullock,* 615 S.W.2d 175, 176 (Tex.1981). Although New NGC filed a cross-motion for summary judgment in its response to appellants' motion for summary judgment, the record does not show the cross-motion was ever set for hearing or that the trial court ruled on the cross-motion. Instead, the trial court dismissed all claims by New NGC as moot. New NGC does not bring a point or issue complaining of the trial court's failure to rule on or failure to grant its cross-motion for summary judgment on the attorneys' fees issue. Therefore, we may not render judgment regarding the fee-shifting provision. *See CRA, Inc.,* 615 S.W.2d at 176; *County of Dallas Tax Collector v. Roman Catholic Diocese of Dallas,* 41 S.W.3d 739, 746 (Tex.App.-Dallas 2001, no pet.). We express not opinion as to whether the Officers and Directors or New NGC would be entitled to a judgment had the issue been presented.

what is called an appeal actually consists of a trial de novo.'" *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 6 (Tex.1986). Thus, the bankruptcy court ruling was final for purposes of preclusion at the time of the hearing.

However, after the trial court's judgment in this case, the bankruptcy court ruling on this issue was reversed on appeal to the district court. *See Nat'l Gypsum Co. v. Prostok,* No. 3:98CV0869P, 2000 WL 1499345. The district court's decision was later affirmed in an unpublished opinion by the Fifth Circuit. *See Nat'l Gypsum Co. v. Prostok (In re Nat'l Gypsum Co.),* —— F.3d ——, No. 00–11097, 2002 WL 1397140. Because the summary judgment on the fee-shifting provision was based on res judicata and collateral estoppel and the prior judgment giving rise to those defenses was reversed on appeal, we must reverse the judgment of the trial court disposing of New NGC's and the Officers' and Directors' claims under the fee-shifting provision. *See Scurlock Oil,* 724 S.W.2d at 6 ("A judgment in a second case based on the preclusive effects of a prior judgment should not stand if the first judgment is reversed."); RESTATEMENT (SECOND) OF JUDGMENTS § 16, cmt. c (1980). *See also, Procter & Gamble Co. v. Amway Corp.,* 242 F.3d 539, 546 (5th Cir.), *cert. denied,* 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001) (district court did not err in giving res judicata effect to prior Utah district court judgment, but because the Utah judgment was later reversed on appeal, the judgment no longer barred the Texas action; the Fifth Circuit reversed res judicata judgment and remanded the case to the district court).

■ Thus, this case presents a rare exception to the general rule that we review a summary judgment ruling on the record that was before the trial court. On our own motion, we take judicial notice of the judgments and opinions of the federal district court and the Fifth Circuit Court of Appeals mentioned above concerning the fee-shifting provision. *See Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.,* 878 S.W.2d 598, 600 (Tex.1994). We reverse the final judgment of the trial court granting Prostok's motion for summary judgment on the counterclaim and cross-claim of the Officers and Directors and New NGC and remand for further proceedings.

## VI. CONCLUSION

The judgment of the trial court, consisting of the March 1, 1999 "Order on Motions for Summary Judgment" as merged into the April 21, 1999 "Final Judgment," is reversed, judgment is rendered in part, and this cause is remanded in part as follows. We render judgment in favor of the TCW Parties against Prostok on the grounds of the statute of limitations. We reverse the summary judgment granted in favor of the Officers and Directors against Prostok and remand for further proceedings. We reverse the trial court's dismissal of New NGC's claims against Prostok and remand for further proceedings. We also reverse the summary judgment granted in favor of Prostok against the Officers' and Directors' and New NGC's claims under the fee-shifting provision and remand for further proceedings.